IN the INTEREST OF J.A.L.: J.A.L., Appellant-Petitioner,

v.

STATE of Wisconsin, Respondent.

Supreme Court

*No. 90–0238. Submitted on briefs May 30, 1991.—Decided June 24, 1991.*

(Also reported in 471 N.W.2d 493.)

For the appellant-petitioner there were briefs by *Michael Tobin* and *Suzanne Hagopian,* assistant state public defenders.

For the respondent there was a brief by *Sally L. Wellman,* assistant attorney general and *Francis D. Collins,* assistant district attorney and *Donald J. Hanaway,* attorney general.

STEINMETZ, J. There are three issues raised on appeal in this case. The first issue is whether the juvenile court, hearing an application for waiver of jurisdiction under sec. 48.18, Stats.,[1] abused its discretion in finding

---

[1] Section 48.18, Stats., provides in pertinent part:

> **(5)** If prosecutive merit is found, the judge, after taking relevant testimony which the district attorney shall present and considering other relevant evidence, shall base its decision whether to waive jurisdiction on the following criteria:
>
> (a) The personality and prior record of the child, including whether the child is mentally ill or developmentally disabled, whether the child has been previously found delinquent, whether such delinquency involved the infliction of serious bodily injury, the child's motives and attitudes, the child's physical and mental maturity, the child's pattern of living, prior offenses, prior treatment history and apparent potential for responding to future treatment.
>
> (b) The type and seriousness of the offense, including whether it was against persons or property, the extent to which it was com-

945

that the petitioner was not "mentally ill" under the statute and when it decided, partly on that basis, to waive its jurisdiction. The second issue is whether certain evidence obtained by electronic monitoring of a conversation of the petitioner was illegally obtained under secs. 968.27–31[2] and improperly admitted at the waiver hearing so as to invalidate the waiver granted by the juvenile court. The third issue is whether the juvenile court erred when in proceeding under sec. 48.18(5) it admitted and weighed evidence as to available treatment programs within the adult correctional system.

This matter originated in the juvenile branch of the circuit court for St. Croix county, the Honorable Robert F. Pfiffner, where the petitioner, J.A.L., a juvenile, was accused of first-degree intentional homicide under sec. 940.01, Stats., for the death of his mother, K.L. Prior to trial, the state filed a petition under sec. 48.18 for the

---

mitted in a violent, aggressive, premeditated or wilful manner, and its prosecutive merit.

(c) The adequacy and suitability of facilities, services and procedures available for treatment of the child and protection of the public within the juvenile justice system, and, where applicable, the mental health system.

(d) The desirability of trial and disposition of the entire offense in one court if the juvenile was allegedly associated in the offense with persons who will be charged with a crime in circuit court.

(6) After considering the criteria under sub. (5), the judge shall state his or her finding with respect to the criteria on the record, and, if the judge determines on the record that it is established by clear and convincing evidence that it would be contrary to the best interests of the child or of the public to hear the case, the judge shall enter an order waiving jurisdiction and referring the matter to the district attorney for appropriate criminal proceedings in the circuit court, and the circuit court thereafter has exclusive jurisdiction.

[2]These sections set forth restrictions on the interception of wire, electronic or oral communications and the admission and use of information obtained thereby in a court of law.

juvenile court to waive its jurisdiction in favor of the criminal court. The juvenile court granted the petition, and J.A.L. appealed. The court of appeals stayed criminal court proceedings and permitted the parties to submit briefs on the merits of the waiver. In an unpublished decision, the court of appeals affirmed the juvenile court, thus upholding the waiver determination. We affirm the court of appeals.

On December 28, 1989, the St. Croix county sheriff's department responded to a call at a home where the dead body of a woman, K.L., was found in a living room. There were obvious gunshots to the head. A subsequent autopsy indicated that the victim had suffered nine separate gunshot wounds to the back and side of the head causing death, as well as a laceration to the head caused by being struck with an instrument at or shortly before her death. The medical examiner indicated that two additional projectiles, apparently of the same caliber, but separate and distinct from the nine bullets in the victim's head, had been fired through the victim's hair and lodged in the door near the victim's body. He opined that the laceration could have been caused by being struck with a gun and that the shots were fired from varying distances and angles.

J.A.L., whose date of birth is February 5, 1974, spoke later in the evening of K.L.'s death with a St. Croix county deputy sheriff, Donald Volkert, at the St. Croix sheriff's department, at which time Volkert took a lengthy statement from J.A.L. concerning the events of the evening. J.A.L. stated that on that evening his mother had been "screaming and cussing" at him. He said that he found himself standing in the living room with a revolver in his hand and blood coming out of the head of his unconscious mother. For purposes of this review, J.A.L. has acknowledged causing K.L.'s death.

J.A.L. also stated that he had previously taken the revolver from his uncle's home, without permission, and secreted the gun in the family home. He indicated that after the shooting he drove the family car to the residence of his grandmother, M.T., and advised her that he had shot his mother. He also indicated that he was worried that his motor vehicle operator's license would be revoked after the shooting.

Deputy Sheriff Volkert testified that J.A.L. was coherent, calm and willing to speak during their interview. Similarly, a social worker who interviewed J.A.L. in the early morning hours of December 29, 1989, at the St. Croix county jail, found him to be calm and relaxed. The social worker also found J.A.L. to be without any expression of remorse or sadness and "age appropriate" as to his maturity.

J.A.L. was detained at the Eau Claire juvenile detention center, a secure custody facility. At that facility, an inmate's conversations with visitors can be monitored through listening devices placed at various points including in the cell blocks and interview rooms. Monitoring, which is undertaken for security reasons, occurs pursuant to established policy based on guidelines set by the Department of Health and Social Services. Not all conversations are monitored; for example, conversations between inmates and social workers, clergy and attorneys are not monitored. The decision whether to monitor is made by the staff on duty, based upon the behavior of the individuals involved.

On January 7, 1990, a juvenile corrections worker monitored a visit between J.A.L. and his father and brother because she believed there was reason to suspect that J.A.L. was planning an escape. The monitored conversation revealed that J.A.L. and his father and brother were discussing J.A.L.'s upcoming court appearance.

The father suggested that, were an opportunity to present itself, the three should "take off and run" to Mexico. J.A.L. agreed, and also indicated that if he received a sentence to Lincoln Hills juvenile detention center, he would flee to Mexico. J.A.L. also said that he would have fled when he was taken to his mother's wake but did not do so because he was handcuffed at the time. Throughout the conversation, J.A.L.'s father referred to K.L. as "the bitch."

The waiver hearing commenced on January 23, 1990, and lasted for five days. Among those testifying was the principal of the high school J.A.L. attended. The principal detailed numerous school disciplinary violations for which J.A.L. was cited in the preceding three years. A school psychologist testified that J.A.L. was not learning disabled, but suffered from a severe motivational problem and was secretive. He indicated that J.A.L. spent 30 percent of his school time in classes for emotionally disabled students and 70 percent of his time in "mainstream" classes. Another witness, a teacher and tutor for J.A.L., testified that J.A.L. had advised him that he did not like his mother. This witness also testified that J.A.L. resented authority and had trouble controlling his temper.

J.K., a juvenile friend of J.A.L., testified that shortly before Christmas 1989, J.A.L. showed J.K. a handgun while on the school bus and stated that he wished somebody would kill his mother, whom he called a "bitch." J.A.L. said to J.K. that perhaps J.A.L. should kill K.L. himself. J.V., another juvenile friend of J.A.L., testified that "fairly recently" prior to the waiver hearing J.A.L. had shown J.V. a gun at school. J.V. described an incident in which J.A.L. said he had left a loaded gun with a hair trigger on his bed at home such that if K.L. or anybody moved the gun it would fire.

Also at the waiver hearing, two employees of the Eau Claire juvenile detention center, one of them being the person who actually monitored the conversation, testified as to the conversation between J.A.L. and his father and brother on January 7, 1990. The other detention center worker who testified spoke as to what he had learned about the conversation by reading a report on it prepared by his colleague. An objection to this testimony alleging it was hearsay and that its use might violate some undefined expectation of privacy was overruled by the court, and no other objection was made at the time.

J.A.L.'s main defense witnesses were his family members, each of whom testified to having had a personal dislike of K.L. They also testified that in their view K.L. had treated J.A.L. badly. Specifically, J.A.L.'s father described K.L. as having been very "harsh" with and generally unsupportive of J.A.L. He indicated that K.L. frequently complained about the condition of the house; at the same time, he said, "she would not work, but she told everybody else she did." J.A.L.'s father and J.A.L. spent weekends away from home at a cabin, where they could talk with each other without being intruded upon by the "shrill hollering" of K.L. J.A.L. often complained about his mother "picking on him." When talk arose as to the possibility of J.A.L.'s father divorcing K.L., he told J.A.L. to "just hang tough for a couple more years." J.A.L.'s father testified that K.L. on a number of occasions told J.A.L. that he should be placed in a foster home. Overall, J.A.L.'s father found K.L. "worse [during] the last couple of months." He found J.A.L. and K.L. "arguing a lot" shortly prior to her death.

A half-brother of J.A.L. testified that K.L. "always found something wrong" with what the other family members were doing. He described having been hit by

K.L.; a brother described K.L. as "constantly hollering" and "bitching" at home. "She was really good for [criticizing a person in front of others]." A half-sister also testified as to having had personal difficulties with K.L. One family member testified that he had once prepared to kill K.L. himself but then decided not to do so. There also was testimony that there had been no physical altercations between J.A.L. and K.L. prior to December 28, 1989. However, there was testimony that J.A.L. had begun "talking back" to and "hollering" at K.L. in the months before her death; that J.A.L. sometimes was "rough" with younger children of a sibling; and that no extremely unusual behavior was noted in J.A.L. prior to the shooting.

Dr. Kenneth Smail, a psychologist who examined J.A.L. for the defense, testified that J.A.L. was of average intelligence. He found him to be nonpsychotic and had no concern that J.A.L. was "out of touch" with reality. He found no sensory disturbance in J.A.L., no delusions and no apparent disturbance as to orientation to time, place or person. Dr. Smail concluded that J.A.L. was not developmentally disabled; that he was not markedly concerned about J.A.L.'s suicide potential; that J.A.L. was not, at the time of the hearing, suffering from attention deficit disorder to a significant degree; that he was not suffering from schizophrenia; that J.A.L. was not in any acute psychological distress and that he was a discouraging treatment candidate.

Dr. Smail testified that results of certain psychological tests given J.A.L. were invalid because they were overinclusive and distorted; it appeared from the results that J.A.L. was trying to appear more disturbed than he actually was. In this connection, there was evidence that, prior to the waiver hearing, J.A.L. had been talking to

others in the juvenile detention about ways to make people think he was insane.

Dr. Smail speculated that J.A.L. exhibited characteristics of a person who might develop schizophrenia in the future or that he might have a personality disorder which disorder "does not constitute mental illness in most appropriate uses of that term." Dr. Smail acknowledged that he had no capsulized psychiatric diagnosis for J.A.L. He concluded in his report that "he just did not know why [J.A.L.'s] rage exploded at that time," resulting in the victim's death. In response to questions by the court, Dr. Smail stated that he had no definitive diagnosis to offer with respect to J.A.L., although he said that the components of the sort of problem J.A.L. appeared to be facing could be addressed by treatment even without a specific diagnosis having been made. He added, however, that a major obstacle to such treatment would exist if J.A.L. were receiving from his family members a message that K.L. had been an unsavory person and that it was not wrong for him to have killed her. In this connection, Dr. Smail noted a lack of emotional response in J.A.L.'s family members to the death of K.L.

Dr. Smail's projection as to treatment potential for J.A.L. was that he would be highly resistive to therapy. He stated that it was difficult to predict whether J.A.L. would engage in similar violent conduct again, but indicated that the possibility of that happening was greater insofar as the killing of K.L. was premeditated.

The second defense psychologist, Dr. Paul Caillier, despite not having seen the delinquency allegations concerning J.A.L. or interviewing J.A.L.'s family members except for one half-sister, opined that J.A.L. was suffering from a dysthymic disorder, which he further characterized as involving a neurotic depression. He indicated that for such a disorder to exist, the sufferer must be

952

affected by depression for at least one to two years, and he concluded that J.A.L. had been so affected on the basis of J.A.L.'s own statements. Dr. Caillier testified that such a disorder is characterized by feelings of helplessness and worthlessness. He acknowledged that dysthymic disorder is not a psychotic illness. He characterized the disorder as a "mental illness" which does not fall within the meaning of sec. 51.01(13)(a), Stats.,[3] but which does fall within the meaning of sec. 51.01(13)(b),[4] insofar as it interferes with the affected's thoughts and perceptions.

Dr. Caillier characterized a ch. 51 mental illness as including psychoses, affective disorders, personality disorders and disorders of childhood and adolescence. However, there appears to be no evidence in the record that Dr. Caillier had ever participated in a ch. 51 proceeding or that he had any experience in determining what conditions might be considered mental illnesses for purposes of ch. 51.

Dr. Caillier acknowledged that J.A.L. appeared to have no major depressive disorder, that he showed no psychotic symptomatology, no loss of contact with reality, no delusions, no hallucinations and no significant loss of touch with reality. He indicated that J.A.L. had no psychosis, no development disability and no organic

---

[3]Section 51.01(13)(a), Stats., provides as follows:

(a) 'Mental illness' means mental disease to such extent that a person so afflicted requires care and treatment for his or her own welfare, or the welfare of others, or of the community.

[4]Section 51.01(13)(b), Stats., provides as follows:

(b) 'Mental illness' for purposes of involuntary commitment, means a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life, but does not include alcoholism.

brain problem. Dr. Caillier found that J.A.L. appeared to be in no acute psychological distress. He ruled out any possibility that J.A.L. might have an attention deficit disorder. He testified that he found J.A.L. to be of average intelligence and that J.A.L. would not be considered "learning disabled" within a school system.

Dr. Caillier described J.A.L. as a person who was able to make connections between his own actions and their consequences. He described the killing as premeditated in the legal sense but not in the psychological sense and noted that J.A.L. indicated to him that he regarded the killing "as almost a positive event in his life."

Dr. Caillier indicated that J.A.L. exhibited a conscience and that treatment could be accomplished which would make J.A.L. into a "model citizen," such treatment requiring at least nine years and definitely no shorter period of time. However, he also testified that J.A.L. would be resistant to psychotherapy. Like Dr. Smail, Dr. Caillier indicated the possible therapeutically harmful influence that a family which minimized the seriousness of K.L.'s killing might constitute to J.A.L. He recommended that J.A.L. be treated with medication and proper psychotherapy. He did not indicate whether he felt such treatment was available within the juvenile correctional system.

Also at the hearing, a juvenile intake officer testified on behalf of the state concerning his investigation into possible dispositional alternatives within the juvenile justice system and his conclusion that treatment within that system was inappropriate. He based this conclusion on the seriousness of the offense, the likely unavailability of post-discharge services and what he considered the likely length and inadequacy of treatment for J.A.L. within the juvenile justice system. Specifically, he testified that no non-secure facility or foster home would

accept J.A.L. because of the killing, and that the only recourse would be a secure facility such as the Ethan Allen or Lincoln Hills facilities. Counseling would be available in those facilities, but only if J.A.L. were motivated would it be productive, the intake officer testified. He also indicated that, although juvenile jurisdiction could be extended to age 25, there was no provision for any kind of subsequent care when such extended jurisdiction would terminate. In this connection, the witness suggested that a course of treatment in the juvenile system might have the effect of affording less protection to the public than treatment in the adult criminal system.

The state also presented the testimony of an adult probation agent who spoke as to community services available to adult parolees and probationers, as well as about the psychological services available in adult correctional institutions. He testified that clinical psychological services are available in adult institutions and that all instructions have educational programs tailored to the inmate's individual needs. He indicated that inmates under age 16 are generally placed at the Ethan Allen facility until they reach age 18, when they are transferred to the adult facility at Green Bay. He also indicated that special needs and any vulnerability of an inmate under age 18 are considered in placement decisions. On cross-examination, he stated that there were waiting lists for some programs in the adult institutions. He also stated that he could not say that a person would get more individualized attention at Ethan Allen than at any of the adult institutions. For his part, J.A.L. presented evidence that the secure juvenile correctional facilities provided adequate security and intensive treatment for emotionally disturbed juveniles.

In rendering its decision waiving its jurisdiction, the juvenile court expressly evaluated the waiver criteria set

out in sec. 48.18(5), Stats. The court began by considering certain "family factors" emphasized by the defense at the hearing focused upon by the defense's psychological experts. In particular, the court noted that there seemed to be "constant bickering" within the family and commented that at the hearing it appeared that "no one had any real liking for [K.L.]." Nevertheless, the court commented that there apparently "wasn't a great deal of personal violence within this family." The court considered that the "family was very good to [J.A.L.]" at least materially, having provided him with harmless ways in which to amuse himself.

The court specifically referred to J.A.L.'s conduct and actions leading up to and involving the shooting. In particular, the court noted that, based upon the number of shots fired at K.L., it appeared that the gun had to be intentionally reloaded in order to complete the act or series of acts. The court also noted the "striking with a blunt object on the top of [K.L.'s] head." The court went on to find that there was a circumstantial basis to conclude that there was premeditation. It also found that "it certainly was violent, it certainly was aggressive, and I think it was wilful."

Concerning the psychological expert testimony produced, the court noted that J.A.L. was not "mentally ill" insofar as both Dr. Smail and Dr. Caillier indicated he was not psychotic. The court referred to Dr. Smail's testimony that J.A.L. was not "mentally ill" in any sense and to Dr. Caillier's statement that under sec. 51.01(13)(b), Stats., J.A.L. could be considered "mentally ill."

Referring to J.A.L.'s personality, the court noted that J.A.L., particularly during his teenage years, was having difficulty in school. The court found that "it was difficult to talk with him" and that "he wouldn't follow

directions." The court noted that "the school authorities felt that there may be some problem that could be rectified with respect to his schooling and steps were taken to have him seen, as well as the family." As to the suggestion of a counselor that J.A.L. might have an attention deficit disorder, the court noted that neither Drs. Smail nor Caillier "felt that he had one or that he was afflicted with that type of disorder." "And he wasn't learning disabled in the—in the sense that he couldn't learn." Rather, the court found, "authority wasn't [J.A.L.'s] cup of tea . . . he didn't really like to do anything he didn't want to do."

The court considered the psychologists' observation that J.A.L. was "mentally immature." The court noted that he was "a recluse or a loner." "[H]e had very few, if any, friends in his age group or class in school." "Whether this was by his design, I'm inclined to think it was. As the people from the juvenile detention center seem to indicate, he picked who he wanted to be with," and if he couldn't find people to his liking, the court said, "he apparently got along quite well by himself." "It's true that he has poor self-esteem, poor self-worth, in the sense that he's [a] defeatist and he's not a very social person, [but] [n]either psychologist felt he was antisocial." Referring to his pattern of living, the court noted "no evidence here that [J.A.L.] had any real problem relating, just that he didn't choose to."

The court noted that J.A.L. was physically mature and that he had no prior record of a serious nature. It also referred to J.A.L.'s motives, his apparent attitude "of resignation," and to the fact that there was "little remorse shown" by J.A.L. or any of his family. "There certainly is no feeling of guilt that has been exhibited."

As to prior treatment history, the court noted an attempt at medication that was discontinued after a

brief time because of lack of program funding or family interest. The court also noted the opinion of "school authorities [who] felt that some investigation ought to be made to see whether or not the situation couldn't be bettered." With regard to the likelihood of success of treatment in the future, the court referred to testimony of Dr. Smail, which indicated that the prospects of success were not very likely and that any attempts at treatment would need to be made in a structured setting over a long period of time. The court also noted the similar testimony of Dr. Caillier and his opinion that treatment would be required to the age of 25 years, which the court found to be curiously "quite convenient with the extended jurisdiction statute."

In this connection, the court referred to the juvenile system's treatment facilities. "They do have programs, they are staffed and they have counseling availability, psychologist availability, some outside psychiatric help and they have schooling programs." The court expressed doubt that the juvenile system could adequately guarantee "confinement or treatment to the maximum permitted by statute." In its extensive discussion applying sec. 48.18(5), Stats., to this case, which discussion required some 20 pages of transcript, the court made no reference to the conversation between J.A.L. and his family at the juvenile detention center. It is apparent the court did not rely on the conversation in reaching its decision.

The court concluded that "because of the serious[ness] of the offense and taking into account all of the other criteria" in sec. 48.18(5), Stats., the evidence was "clear, satisfactory and convincing that it would be contrary to the best interests of [J.A.L.] or the public for the juvenile system to hear the case." The court decided to waive its jurisdiction and referred the matter to the district attorney for further proceedings.

On appeal, the court of appeals upheld the juvenile court holding in the negative as to each issue set forth above. As to the first issue, the court of appeals said that, based upon its review of the record, it could not conclude that the juvenile court had abused its discretion insofar as "[e]very psychological expert stated that J.A.L. was not mentally ill in the strict legal sense" and "there was sufficient evidence to support the conclusion that J.A.L. was not mentally ill." Thus, the court of appeals held that there was no basis upon which to conclude that the juvenile court had improperly waived its jurisdiction.

As to the second issue, while the court of appeals found that the evidence was inadmissible under sec. 968.30(8) and (9), Stats., it "presumed that a judge knows what evidence is substantive and will disregard extraneous matters." The court of appeals cited *Boyles v. State,* 60 Wis. 2d 767, 767, 211 N.W. 512 (1973), in this connection, saying that in a trial to the court the admission of improper evidence is to be disregarded as harmless unless it clearly appears the finding would probably have been different. The court of appeals also cited *State v. Dyess,* 124 Wis. 2d 525, 543-45, 370 N.W.2d 222, 231-32 (1985).

The court of appeals also held that the trial court did not err with respect to sec. 48.18(5), Stats., by admitting evidence relating to the availability of treatment programs within the adult correctional system. The court of appeals determined that "[c]omparison of facilities and services available in the adult system as opposed to the juvenile system is required under sec. 48.18(5)(c), Stats.," explaining its view that "[t]he adequacy and suitability of facilities, services and procedures in the juvenile system as it pertains to a particular juvenile cannot be evaluated in a vacuum."

\* \* \* \*

With regard to the first issue, J.A.L. argues that there was no reasonable basis for the juvenile court's finding that he was not "mentally ill" under sec. 48.18(5), Stats. Insofar as the juvenile court should have found him "mentally ill," J.A.L. argues, the juvenile court abused its discretion in granting the petition for waiver under the statute and must be reversed. We reject J.A.L.'s argument.

Waiver of jurisdiction under sec. 48.18, Stats., is within the sound discretion of the juvenile court. *In Interest of D.H.,* 76 Wis. 2d 286, 305, 251 N.W.2d 196 (1977); *In Interest of C.W.,* 142 Wis. 2d 763, 766-67, 419 N.W.2d 327 (1987). In considering a waiver petition, the juvenile court is to regard the best interest of the child as being the paramount consideration. *D.H.,* 76 Wis. 2d at 304-05; *C.W.,* 142 Wis. 2d at 767. The juvenile court has discretion as to the weight it affords each of the criteria under sec. 48.18(5) in deciding whether to waive jurisdiction. *In Interest of G.B.K.,* 126 Wis. 2d 253, 259, 376 N.W.2d 385 (Ct. App. 1985). A juvenile judge is to state his or her finding with respect to the criteria on the record, and, if the judge determines on the record that it is established by clear and convincing evidence that it would be contrary to the best interests of the child or of the public for the juvenile court to hear the case, the judge must enter an order waiving jurisdiction and referring the matter to the district attorney for appropriate criminal proceedings in the criminal court. Section 48.18(6).

We review a court's exercise of discretion to determine if there is an abuse. *Johnson v. Johnson,* 78 Wis.

2d 137, 143-44, 254 N.W.2d 198 (1977). An appellate court first looks to the record to see whether that discretion was in fact exercised. *McCleary v. State,* 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971). Assuming discretion was exercised, the appellate court will look for reasons to sustain the trial court's discretionary decision. *Loomans v. Milwaukee Mut. Ins. Co.,* 38 Wis. 2d 656, 662, 158 N.W.2d 318, 320 (1968). An appellate court will reverse a juvenile court's waiver determination if and only if the record does not reflect a reasonable basis for the determination or a statement of the relevant facts or reasons motivating the determination is not carefully delineated in the record. *C.W.,* 142 Wis. 2d at 766-67.

J.A.L. does not claim that the juvenile court failed to exercise discretion. Nor does J.A.L. assert that the juvenile judge, contrary to sec. 48.18(6), Stats., and *C.W.,* failed to state his findings on the record or determine on the record that it would be contrary to J.A.L.'s best interest or the interest of the public for the juvenile court to hear J.A.L.'s case. Even a casual reading of the record indicates there would appear to be no basis for such a claim. Rather, relying upon *State v. Hutnik,* 39 Wis. 2d 754, 757, 159 N.W.2d 733, (1968) (misapplication or erroneous view of law is an abuse of discretion), J.A.L. asserts that the juvenile court abused its discretion by applying an incorrect legal standard to determine whether J.A.L. was "mentally ill" under sec. 48.18(5), Stats. In the alternative, J.A.L. asserts that, even if the juvenile court applied a correct standard, it abused its discretion in determining that J.A.L. was not "mentally ill" under that standard.

In fact, as J.A.L. notes, the juvenile court did not specifically articulate the particular standard it used under the statute. This does not necessarily mean, however, that the court did not use a correct standard or that

961

the court abused its discretion.[5]

■■

A question on the legal standard set by a statute is really a question as to the meaning of the statute. A question as to the meaning of a statute presents a question of law as to which this court's review is *de novo.* *Town of Clearfield v. Cushman,* 150 Wis. 2d 10, 19, 440 N.W.2d 777 (1989). The sole purpose of such a review is to ascertain the intent of the legislature. *Marshall-Wis. v. Juneau Square,* 139 Wis. 2d 112, 133, 406 N.W.2d 764 (1987). In ascertaining that intent, this court's first resort is to the plain language of the statute itself. *Id.* If it clearly and unambiguously sets forth the legislative intent, it is this court's duty merely to apply that intent to the facts and circumstances of the question presented; this court is prohibited from looking beyond the language of the statute to ascertain its meaning. *Id.* If and only if the language of the statute does not clearly or unambiguously set forth the legislative intent, however, will this court construe the statute so as to ascertain and carry out the legislative intent. *Green Bay Redevelopment Authority v. Bee Frank,* 120 Wis. 2d 402, 408–09, 355 N.W.2d 240 (1984). In construing a statute, this court looks to sources outside of the language of the statute itself. *Marshall-Wis.,* 139 Wis. 2d at 133. In this regard, we examine the history, context, subject matter,

---

[5]It is worthy of mention that sec. 48.18(6), Stats., although calling for a juvenile judge who orders a waiver to state his or her findings on the record and determine on the record that it would be contrary to the juvenile's best interest or that of the public for the juvenile court to hear the case, does not require that a juvenile court expressly set forth on the record the standard it uses in determining whether a juvenile is "mentally ill" under the statute, and J.A.L. does not argue to the contrary except for a single conclusory and unpersuasive sentence in his reply brief.

scope and object of the statute. *Bee Frank,* 120 Wis. 2d at 409. The fundamental axiom of judicial construction is that it avoid any result that would be absurd or unreasonable under the facts and circumstances of the case. *Id.* at 408–09.

Neither sec. 48.18(5), Stats., nor case law sets forth the meaning of "mental illness" under the statute. In specifying the factors pertinent to a waiver determination, the statute merely refers to the "personality and prior record of the child, including whether the child is mentally ill . . .." Section 48.18(5)(a). Thus, the standard that is to be applied in determining whether an individual is "mentally ill" under the statute is not clear from the plain language of the statute.

J.A.L., expressly referring in his brief to the history, context, subject matter, scope and object of sec. 48.18(5), Stats., asserts that the proper standard for a determination of whether a juvenile is "mentally ill" under sec. 48.18(5) is found in sec. 51.01(13)(b), which offers a broad definition of "mental illness." Specifically, sec. 51.01(13)(b) defines "mental illness" for involuntary commitment purposes, and it provides:

> 'Mental illness,' for purposes of involuntary commitment, means a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life . . ..

Section 51.01(13)(b).

However, insofar as sec. 51.01(13)(b), Stats., by its own terms is specifically intended "for purposes of involuntary commitment," there would appear no obvious rationale for applying its definition of "mental illness" to a sec. 48.18 proceeding, which does not involve involun-

tary commitment issues. Perhaps more logically, because it contains no language by which it specifically addresses itself to a particular type of proceeding, the definition of "mental illness" provided in sec. 51.01(13)(a) might be applicable. That definition, which is more narrow than that of sec. 51.01(13)(b), indicates that:

> 'Mental illness' means mental disease to such extent that a person so afflicted requires care and treatment for his or her own welfare, or the welfare of others, or of the community.

Section 51.01(13)(a).

Another possible definition of "mental illness" under sec. 48.18(5), Stats., could be based upon the language found in sec. 971.15(1), which pertains to the so-called "insanity defense" for a criminal defendant. The definition of "mental illness" that might be derived from sec. 971.15(1)'s plain language would also appear to be more narrow than that of sec. 51.01(13)(b), although sec. 971.15 arguably has no relevance at all to sec. 48.18 at least insofar as sec. 971.15 never uses the term "mental illness." Section 971.15(1) provides that:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

Section 971.15(1).

For its part, the state does not ask this court to determine that any one of these definitions of "mental illness" is applicable in all sec. 48.18, Stats, proceedings.[6]

---

[6]The state does note that when the new children's code was initially enacted, the waiver statute provided that the court should consider whether the child is "a proper subject for com-

Instead, the state indicates that for purposes of this case it has "no quarrel" with the use of the sec. 51.01(13)(b) standard put forth by J.A.L., because, it says, under that broad standard or any other possible standard, the juvenile court properly determined that J.A.L. was not "mentally ill." We agree.

One argument that can be inferred from the state's position is that the broad standard set forth in sec. 51.01(13), Stats., essentially incorporates within its scope the narrower standards found in sec. 51.01(13)(a) and sec. 971.15(1) taken by itself. Because it can be inferred from the record that the juvenile court applied the sec. 51.01(13)(b) standard or a standard similar in scope, and because it appears possible if not likely that there is not a standard more favorable to J.A.L. than that of sec. 51.01(13)(b) which the juvenile court could have applied, we are satisfied that the juvenile court did not apply an incorrect standard to J.A.L.'s disadvantage. J.A.L.'s argument based upon *Hutnik* therefore must fail.

We reach this conclusion without determining if the broad standard established by sec. 51.01(13)(b), Stats., is in fact always required in determining whether a juvenile is "mentally ill" for purposes of sec. 48.18 We save that question for another case when the court is satisfied that the parties have fully and adequately argued the question in their briefs. We need not answer that question here

---

mitment to a facility for the mentally ill." Section 31, ch. 354, Laws of 1977. In a trailer bill to the code, that language was changed to require that the court consider whether the child is mentally ill. Section 13, ch. 300 Laws of 1979. In addition, the trailer bill amended sec. 48.18(5)(c) to include its present language. While noting these statutory changes, the state does not propose what the legislative intent might be.

because we find that, even given the broad meaning of "mental illness" put forth in the sec. 51.01(13)(b) standard, the trial court did not abuse its discretion in finding that J.A.L. was not "mentally ill" under sec. 48.18(5).

Whether a juvenile is "mentally ill" for purposes of waiver under sec. 48.18(5), Stats., is a conclusion of law for the juvenile court based on facts adduced at the hearing. In making its factual inquiry, the trial court is able to say what weight, if any, should be attributed to expert testimony. With respect to an appellate court's review of the trial court's findings of fact, we have stated that:

> Findings of fact by the trial court will not be upset on appeal unless they are against the great weight and clear preponderance of the evidence. The evidence supporting findings of the trial court need not in itself constitute the great weight or clear preponderance of the evidence; nor is reversal required if there is evidence to support a contrary finding. Rather, to command a reversal, such evidence in support of a contrary finding must itself constitute the great weight and clear preponderance of the evidence.

*Cogswell v. Robertshaw Controls Co.,* 87 Wis. 2d 243, 249-50, 274 N.W.2d 647 (1979). This standard is essentially the same as the clearly erroneous standard, which is set forth in sec. 805.17. *Noll v. Dimiceli's, Inc.,* 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct. App. 1983); *State v. Wurtz,* 141 Wis. 2d 795, 799 n.1, 416 N.W.2d 623 (Ct. App. 1987). Where there are a number of reasonable inferences that might be drawn as to a particular situation, the reviewing court must accept the one drawn by the trier of fact. *State v. Poellinger,* 153 Wis. 2d 493, 506-07, 451 N.W.2d 752 (1990).

J.A.L. appears to argue that the horrendous nature of the act that took place on December 28, 1989, is itself sufficient to show that he was "mentally ill." He also argues that his concern that he would lose his right to drive after committing the act indicates that he was "mentally ill" and not merely, for example, emotionally immature. He offers no persuasive authority for these propositions. In contrast, there are specific factors which support the trial court's decision to reject the defense's expert testimony as indicative of "mental illness."

Dr. Smail testified that it could not be said that J.A.L. presently suffered a "mental illness." He could say only that J.A.L. might develop a "mental illness" in the future. For his part, Dr. Caillier testified that J.A.L. had a "mental illness" as that term is defined in sec. 51.01(13)(b), Stats., but he disagreed with the diagnosis of the other expert. In addition, there was no evidence that he was familiar with the involuntary commitment proceedings under ch. 51 or with how "mental illness" has been interpreted under that standard. When experts offer a variety of possible disorders a subject may suffer from but fail to reach a consensus or to concur in a diagnosis, the factfinder is not required to accept the opinions of the experts that the subject is "mentally ill." *Matter of Coconino County Juvenile Act J-10359,* 157 Ariz. 81, 89–90, 754 P.2d 1356 (Ct. App. 1987). Moreover, where, as here, there is evidence that the subject "overplayed" his symptoms of "mental illness" in order to make a positive impression on the examiners, a court can conclude that the experts' opinions do not accurately reflect the child's personality or potential risk to society. *In Matter of Welfare of J.L.B.,* 435 N.W.2d 595, 601 (Minn. Ct. App. 1989).

■

On this record, a factfinder could reasonably have concluded that J.A.L. was "mentally ill." However, a factfinder could also reasonably conclude, as did the juvenile court, that J.A.L. was not "mentally ill." In light of the deference that is owed to the juvenile court's finding of fact in this regard, this court upholds that finding of the juvenile court and concludes that the juvenile court did not abuse its discretion in determining that J.A.L. was not "mentally ill."

J.A.L.'s argument that the juvenile court abused its discretion in granting the state's petition for a waiver is essentially based upon the assertion that the court reached a mistaken result in concluding that he was not "mentally ill." The state argues that, even if it could be said that the juvenile court made a mistake and should have concluded that J.A.L. was "mentally ill," the waiver decision would still be valid. We agree.

■

J.A.L. appears to have assumed that, had he been found "mentally ill," he could not under any circumstances properly have been waived. There is no basis for such an assumption. First, the statute does not require or even necessarily suggest that a juvenile found "mentally ill" not be waived into the criminal court. In *G.B.K*, the court of appeals upheld a waiver order even though the juvenile had produced some evidence that he was mentally ill and had requested commitment under ch. 51. The court of appeals held that even if the juvenile's condition could be considered a "mental illness," a waiver was not precluded. *G.B.K.,* 126 Wis. 2d at 259. The juvenile court could reasonably conclude that a mental commitment would not offer suitable alternatives in terms of sec. 48.18(5)(c)'s reference to treating the juvenile or protecting the public. *Id.* at 258–59. *G.B.K.* is

968

thus instructive in this case, because there is little evidence in this record that J.A.L. could be committed or that commitment would offer suitable alternatives for treatment of J.A.L. and protection of the public.

Moreover, the fact that a child suffers a mental illness may favor waiver rather than retention in the juvenile system because the mental illness itself may make rehabilitation within the juvenile system less likely. *See Commonwealth v. Matthews,* 406 Mass. 380, 386–87, 548 N.E.2d 843, 846–47 (1990). In this case, there was evidence that any mental illness J.A.L. might have had would mitigate against retention in the juvenile system. Specifically, both experts testified that J.A.L. would be resistant to treatment and one expert said that any successful treatment, if such could be achieved, would require the remaining nine years that J.A.L. would have in the juvenile system under its extended jurisdiction. The juvenile court was not required to accept the experts' estimates of the time needed for treatment and rehabilitation as necessarily accurate. *Coconino County J-10359,* 154 Ariz. at 89; *Matter of Coconino County Juvenile Act J-9896,* 154 Ariz. 240, 741 P.2d 1218, 1221 (1987). Even if the time estimates were necessarily accurate and reliable as to their best possible predictions regarding J.A.L.'s condition, waiver may have been advisable insofar as retention in the juvenile system was nevertheless a less suitable alternative for treatment of J.A.L. and protection of the public. On the record of this case, such a determination by the juvenile court would not have been an abuse of discretion.

A second reason why J.A.L. is mistaken in assuming that the case of a "mentally ill" juvenile must not be waived into criminal court lies in the fact that a juve-

nile's mental situation is but one of many factors that the juvenile court is to take into account under sec. 48.18(5), Stats., in exercising its discretion with respect to a waiver question. As *G.B.K.* indicates, each of the criteria set out in the statute is to be accorded only relative and not absolute weight. Among other things, the act of killing K.L. was vicious, aggravated and premeditated, and J.A.L. showed no remorse after the fact. J.A.L.'s family members also exhibited little if any sadness at what had transpired. The evidence shows that J.A.L. strongly resents authority and, although he is of average intelligence, does not apply himself in a constructive way in the classroom and elsewhere. The evidence also indicates little potential for responding to treatment. Under these circumstances, even if J.A.L. had been mentally ill, it would not have been an abuse of discretion for the juvenile court to determine that a waiver was nevertheless appropriate.

Thus, we hold that the juvenile court, in hearing the state's application for waiver of jurisdiction under sec. 48.18, Stats., did not abuse its discretion in finding that the petitioner was not "mentally ill" under the statute and when it decided, partly on that basis, to waive its jurisdiction.

The second issue pertains to a claim by J.A.L. that the evidence obtained by the monitoring of his conversation with his family in the detention center was illegally obtained under secs. 968.27–.31, Stats., and improperly admitted at the hearing so as to invalidate the waiver granted by the juvenile court. The issue presented by this claim is divisible into three parts.[7] First, there is a

[7]There is a dispute between the parties as to whether J.A.L. has stated a constitutional objection in addition to this statutory objection to the monitoring of the conversation and admission of the evidence. Because of the way in which the court disposes of

question as to whether the evidence was obtained in violation of secs. 968.27–31 and improperly admitted on that basis. Second, even if the first question is answered in the affirmative, there is a question as to whether admission of the evidence was nevertheless allowed by virtue of sec. 48.299(4)(b), which provides that neither common law nor statutory rules of evidence are binding at a waiver hearing under sec. 48.18. Third, even if both preceding questions were to be answered in his favor, there is a question as to whether the admission of the evidence was nevertheless harmless error such that the waiver hearing was not invalidated. Because the court answers this third question in the affirmative, the court need not and does not rule as to the first two questions comprising the issue.[8]

---

the ultimate question, finding any error harmless, the court does not address the question of whether in fact J.A.L. has successfully stated a constitutional claim.

[8]However, the court would note that at least arguably J.A.L.'s conversation with his family was not illegally obtained with respect to secs. 968.27–31, Stats. We do not reach this issue. An oral communication as defined in sec. 968.27(12) is not protected unless there is an expectation that the communication is private and that expectation is justifiable. Section 968.27(9). Even if J.A.L. had an expectation of privacy, such an expectation arguably was not justifiable in the context of a jailhouse setting. Other courts addressing similar circumstances have recognized that an institution's need for security and safety, which was the purpose of the monitoring here, sometimes outweighs an individual's right to privacy. *See People v. Blehm,* 623 P.2d 411 (Colo. Ct. App. 1980); *People v. Clark,* 125 Ill. App. 3d 608, 466 N.E.2d 361 (1984). In addition, sec. 968.27(7)(a)2 provides that electronic monitoring is not prohibited with respect to a "law enforcement officer in the ordinary course of his or her duties," and that provision very well might apply here. *See United States v. Paul,* 614 F.2d 115, 117 (6th Cir. 1980).

971

In holding that the admission of J.A.L.'s conversation with his family was harmless, the court of appeals suggested that there is a presumption that the juvenile court as the trier of fact was aware of any impropriety of admitting the evidence and thus did not consider it in rendering its decision. To the extent the court of appeals relied upon such an assumption, the court of appeals erred. This case does not present a situation where evidence which is admitted to the court as trier of fact is admissible for one purpose but not for another purpose, where there may or may not be a unique harmless error standard. *See Boyles,* 60 Wis. 2d at 767; *State v. Cathey,* 32 Wis. 2d 79, 90, 145 N.W.2d 100 (1966). Here, the juvenile court evidently considered the evidence fully and properly admissible and there is no indication that it was admitted for one purpose but not another purpose.

As when a court erroneously admits evidence to a jury, the test for harmlessness when the court acting as trier of fact erroneously admits evidence is found in *Dyess,* 124 Wis. 2d at 543-45. Under *Dyess,* error is harmless if there is no reasonable possibility the error contributed to the verdict, a reasonable possibility being one which is sufficient to undermine confidence in the outcome of the proceeding. *Id.* While this does not apply in a waiver hearing, it is informative.

The question thus arises as to the proper methodology by which to ascertain whether an error in admission

---

Moreover, even if the evidence was obtained and admitted in violation of secs. 968.27-31, Stats., sec. 48.299(4)(b) would seem to be controlling here in allowing for admission of the evidence. The only exception that sec. 48.299(4)(b) allows to its broad antidote to the common law and statutory rules of evidence is that the "court shall give effect to the rules of privilege recognized by law." Rules of privilege are set out in ch. 905, and would not appear to come into play in any way here.

of evidence was harmless in the context of a waiver hearing. In this regard, the state suggests that the methodology here should parallel that used in the context of a sentencing hearing. We agree.

A waiver hearing and a sentencing hearing are analogous in a number of important ways. Generally, the rules of evidence do not apply at either hearing. Sections 48.299(4)(b) and 911.01(4)(c), Stats. The decisions made at both types of hearing are based on a variety of factors which are not purely factual but which involve elements of judgment as well. For example, at sentencing, the trial court must consider the gravity of the offense, the character of the offender and the need for protection of the public. *Elias v. State,* 93 Wis. 2d 278, 284, 286 N.W.2d 559 (1980). The court may also consider factors such as the offender's past history of criminal offenses, history of undesirable behavior patterns, personality, character and social traits, age, education and background. *State v. Macemon,* 113 Wis. 2d 662, 667–68, 335 N.W.2d 402 (1983). Similarly, at the waiver hearing, the court must consider the personality and prior record of the juvenile, whether he is mentally ill, prior delinquencies and the nature of those acts, the child's motives and attitudes, the type and seriousness of the present offense, the adequacy and suitability of the facilities, services and procedures available for treatment of the juvenile and protection of the public in the juvenile system. Section 48.18, Stats. Moreover, both the sentencing and waiver decisions are reviewed under the abuse of discretion standard. *Id.,* at 667; *In Interest of C.D.M.,* 125 Wis. 2d 170, 176, 370 N.W.2d 287 (Ct. App. 1985); *C.W.,* 142 Wis. 2d at 766.

In *State v. Way,* 113 Wis. 2d 82, 91, 334 N.W.2d 918 (Ct. App. 1983), the court of appeals refused to reverse a

sentence on the ground that there was a factual error in the presentence report, stating that it found that there were "sufficient other facts presented in the record which would justify the trial court sentencing" as it did. Applying this standard in the waiver hearing context where evidence was improperly before the juvenile court, the reviewing court should uphold the waiver order if, excluding the erroneous evidence, the waiver decision is sustainable as a proper discretionary act based on the other facts of the record. Under this standard, the waiver determination must be upheld, and we so hold.

The act in question, as admissible evidence shows, was extraordinarily violent, aggressive and serious in nature. There was ample evidence that the offense was premeditated, including the fact that J.A.L. had talked with others about killing K.L. and evidently reloaded the gun in order to complete his shooting of her. J.A.L. expressed no remorse for what he had done. At school, he worked below his ability, was unmotivated and was disrespectful of authority. Although his emotional problems were described in various terms, even his own experts testified he would need extensive therapy, and that he would be resistant to therapy and that there could be a repetition of violent conduct. Certain evidence at least suggested that the juvenile system would be inadequate to deal with J.A.L.'s problems. It was apparent from the admissible testimony of J.A.L.'s father and siblings that they saw K.L. as a wrong-doer; they appeared not to blame J.A.L. in any way for K.L.'s death. None expressed any remorse for the fact of K.L.'s death that is evident from the record. In reaching its decision, the juvenile court noted all of these factors.

Given all of those factors, the juvenile court's waiver determination appears as an appropriate exercise of dis-

cretion. This conclusion is supported by the fact that, insofar as the juvenile court in reaching its decision made no reference to the conversation at the detention center, there is no indication that the juvenile court relied upon the conversation even minimally. There is no reasonable possibility that any error contributed to the juvenile court's waiver determination. Accordingly, we hold that any error was harmless.

The third issue concerns whether the juvenile court erred when in proceeding under sec. 48.18(5), Stats., it admitted and weighed evidence as to available treatment programs within the adult correctional system. This issue relates to the statutory requirement that a juvenile court consider "[t]he adequacy and suitability of facilities, services and procedures available for treatment of the child and protection of the public within the juvenile justice system, and, where applicable, the mental health system." Section 48.18(5)(c), Stats.

J.A.L. claims that the juvenile court was not permitted to hear evidence about and consider the adequacy and suitability of facilities, services and procedures available within the adult correctional system for treatment of him and protection of the public. He bases this argument on the fact that the statute does not expressly set forth that that information may be admitted and considered. In this regard, he attempts to rely upon *C.W.* for support.

In *C.W.*, the juvenile court refused to waive jurisdiction in large part because of its belief that "an adult trial court would improperly sentence C.W. if he were found guilty." *C.W.*, 142 Wis. 2d at 768. The juvenile court held this apprehension because it believed what it had been told at a judicial conference to the effect that 80 percent of all juveniles waived to adult court were placed on

probation. *Id.* at 766. Noting that a juvenile court's belief that an inappropriate sentence might be imposed by the adult court is not one of the criteria established by sec. 48.18(5), Stats., the court of appeals held that "[a] juvenile court has no authority to deny waiver on the grounds that another court may give a more lenient sentence than the juvenile court thinks is appropriate. To speculate as the juvenile court did in this instance was an abuse of discretion." *Id.* at 768. J.A.L.'s reliance upon *C.W.* is unpersuasive.

To say that a juvenile court errs in refusing to waive jurisdiction because it fears the criminal court will not impose an appropriate sentence is not to say that the juvenile court must remain steadfastly ignorant of the resources, treatment and programs available in the adult system. Contrary to J.A.L.'s claim, comparison of adult system resources with the alternatives in the juvenile system does not invite speculation about the probable adult sentence. The juvenile court heard and considered only information about services in the adult system; the testimony did not address the potential sentence that J.A.L. might receive.

Common sense supports the idea that where the question is whether the best interests of the child and the public would be served by retaining juvenile jurisdiction or by transferring jurisdiction to the criminal court, and where one factor in that determination is the treatment and rehabilitation opportunity in the juvenile system, in order to fully and fairly assess matters, the juvenile court may also make itself aware of and consider the opportunity available in the criminal system. As the court of appeals said, "[t]he adequacy and suitability of facilities, services and procedures in the juvenile system as it pertains to a particular juvenile cannot be evaluated in a vacuum." It is reasonable and in accord with the

statute for a juvenile court to compare the facilities and services available in the juvenile system with those available in the criminal system. For a juvenile court to do so does not amount to impermissible speculation as to what a juvenile, such as J.A.L., might receive as a disposition in a criminal court.

Thus, we hold that the juvenile court did not err when in proceeding under sec. 48.18(5), Stats., it admitted and weighed evidence as to available treatment programs within the adult correctional system.

It follows from the court's holdings here that the juvenile court did not abuse its discretion or otherwise err so as to invalidate its waiver of jurisdiction. The waiver of jurisdiction was appropriate.

*By the Court.*—The decision of the court of appeals is affirmed.