# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP646-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent, |
| | v. |
| | Leopoldo R. Salas Gayton, |
| | Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 358 Wis. 2d 709, 856 N.W.2d 345)
(Ct. App. - Unpublished)

| | |
|---|---|
| OPINION FILED: | July 6, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 14, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dennis R. Cimpl and Ellen R. Brostrom |
| JUDGE: | Milwaukee |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | BRADLEY, A. W., J. and ABRAHAMSON, J. concur (Opinion filed). |
| DISSENTED: | |
| NOT PARTICIPATING: | ROGGENSACK, C. J. did not participate. |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Colleen D. Ball*, assistant state public defender, and oral argument by *Colleen D. Ball*.

For the plaintiff-respondent, the cause was argued by *Christopher G. Wren*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general.

There was an amicus curiae brief by *Jeffrey O. Davis*, *Haar Katta*, and *Quarles & Brady LLP*, Milwaukee, WI on behalf of the Irrevocable Trust for the Benefit of Hayden Isabella Lamb.

There was an amicus curiae brief by *Matthew S. Pinix*, *Karyn Rotker*, and ACLU of Wisconsin Foundation, Milwaukee, *Claudia Valenzuela* (pro hac vice) and National Immigrant Justice Center, Chicago, IL, *Barbara J. Graham* and Catholic Charities Legal Services for Immigrants, Milwaukee, and *Stacy Taeuber*, University of Wisconsin Law School Immigrant Justice Clinic. Oral argument by *Matthew S. Pinix*.

No. 2013AP646-CR
(L.C. No. 2011CF73)

STATE OF WISCONSIN         :       IN SUPREME COURT

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**Leopoldo R. Salas Gayton,**

      **Defendant-Appellant-Petitioner.**

**FILED**

**JUL 6, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals affirming the Milwaukee County Circuit Court's denial of a postconviction motion by Leopoldo Salas Gayton (Salas Gayton).[1]

¶2 Salas Gayton pled no contest to two charges that arose after he killed Corrie Damske while he was driving under the influence of alcohol in the wrong direction on a Milwaukee

---

[1] State v. Salas Gayton, No. 2013AP646-CR, unpublished slip op. (Wis. Ct. App. Oct. 7, 2014).

freeway.  At sentencing, the circuit court focused its remarks on the serious crime of drunk driving and its potential consequences.  It ultimately sentenced Salas Gayton to 15 years of initial confinement, the statutory maximum, followed by 7 years of extended supervision.  On several occasions during its remarks, the circuit court mentioned Salas Gayton's immigration status, describing him as an "illegal alien," "here illegally," and an "illegal."  However, the court made clear that any unlawful conduct related to immigration represented no more than a "minor factor" or "minor character flaw."

¶3  In a postconviction motion, Salas Gayton argued, among other things, that the sentencing court erroneously exercised its discretion by relying upon an improper factor when it considered his immigration status at sentencing.  The circuit court denied his motion, and the court of appeals affirmed. Because we conclude that the circuit court's comments do not demonstrate reliance on an improper factor at sentencing and therefore did not deny Salas Gayton due process of law, we affirm the decision of the court of appeals.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

¶4  While driving drunk on Interstate 94 in Milwaukee on the morning of January 1, 2011, Salas Gayton struck a vehicle driven by Corrie Damske, who died at the scene shortly after the collision.  The collision occurred at approximately 7:20 a.m.

Salas Gayton entered the freeway[2] near 35th Street and began traveling in the wrong direction in the westbound lanes.  He struck one vehicle before colliding head-on with Damske near 20th Street, at the southwest corner of the Marquette University campus.  His vehicle ricocheted and struck a third vehicle after his collision with Damske.  Salas Gayton broke his foot as a result of the collisions.

¶5  In the hours before the collision, Salas Gayton consumed 2 beers at home before consuming a 12-pack of beer while driving around Milwaukee.  He tossed empty cans out the car window as he drove.  After the collision, he could not account for a large period of time and could not remember when he consumed his last beer.  A test of Salas Gayton's blood approximately 2 hours and 20 minutes after the collision returned a blood alcohol content of .145.

¶6  When officers questioned Salas Gayton after his arrest, he told them that he entered the freeway because he saw police lights flashing in his mirror and he traveled in the

---

[2] Wisconsin Stat. § 990.01(7a) (2013-14) defines an "expressway" as "a divided arterial highway for through traffic with 'full' or 'partial' control of access and generally with grade separations at intersections."  A freeway, in contrast, "means a highway with full control of access and with all crossroads separated in grade from the pavements for through traffic."  Wis. Stat. § 990.01(9a).  Although Interstate 94 seems to meet both definitions, we use the term "freeway" throughout the opinion.

All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

wrong direction out of confusion as he attempted to evade police. He wanted to avoid being pulled over because he feared going to jail for driving without a valid license. A report from the Milwaukee County Sheriff's Office indicates that at the time of his arrest he informed officers that he immigrated to the United States illegally and that he had lived in the United States for approximately 13 years before the collision.[3] Salas Gayton is originally from Mexico, and he is not an American citizen. At the time of the collision, he was 41 years old.

¶7    A criminal complaint and information filed in the Milwaukee County Circuit Court on January 6, 2011, charged Salas Gayton on three counts: (1) homicide by intoxicated use of a vehicle, contrary to Wis. Stat. §§ 940.09(1)(a) and 939.50(3)(d); (2) homicide by intoxicated use of a vehicle (prohibited alcohol concentration), contrary to Wis. Stat. §§ 940.09(1)(b) and 939.50(3)(d); and (3) operating without a license, causing death, contrary to Wis. Stat. §§ 343.05(5)(b)3.d. and 939.51(3)(a).[4] Although Salas Gayton initially entered not guilty pleas to all three charges, he

---

[3] Salas Gayton submitted a copy of the document from the Milwaukee County Sheriff's Office as an exhibit attached to his postconviction motion.

[4] The statutes cited in the complaint referred to the 2009-10 version of the Wisconsin Statutes.

4

ultimately agreed to plead no contest to the first and third counts.[5]

¶8    The Milwaukee County Circuit Court, Dennis Cimpl, Judge, conducted a lengthy sentencing hearing on July 22, 2011, at which the court heard statements on behalf of Damske and on behalf of Salas Gayton.[6]    After an initial discussion between the court and the parties regarding letters sent to the court on behalf of the victim and the defendant,[7] the hearing proceeded with the State's presentation.

¶9    The attorney for the State began with a lengthy summary of the reasons why the State was "recommending . . . a substantial period of confinement":

> Corrie Damske was a woman who simply was driving on the freeway.  She was going home as many people were going and traveling on January 1st, the holiday, 2011.

---

[5] At the plea hearing, the circuit court indicated that the second count would be dismissed "by operation of law" as a result of the conviction resulting from the plea on the first count.  See Wis. Stat. § 940.09(1m)(a)-(b).  The circuit court also explained the dismissal at sentencing.

[6] In the following paragraphs, we quote at length from statements in the transcript of the sentencing hearing.  To enhance readability, we have clarified punctuation and corrected several misspellings in the transcript, such as the first name of the deceased victim.  The unmarked alterations to quotations from the transcript are also reflected in subsequent quotations in the opinion.

[7] The court received six letters on behalf of Damske and one on behalf of Salas Gayton.  Although not originally included in the record on appeal, the letters were added to the record by a December 9, 2015 order from this court.

She was secured in the fact that she was traveling properly in the right lane when something happened that could happen to make any of us victims of a homicide, and that is that the defendant made a choice——perhaps, because he was intoxicated, not a knowing choice——but he made a choice to get on the freeway and drive the wrong way.

As the Court knows, it's probably the busiest freeway . . . in the whole State of Wisconsin; it's a freeway that leads west from downtown Milwaukee and is as heavily traveled as any freeway in the State of Wisconsin.

The defendant traveling down that freeway had numerous opportunities to stop his car and realize that he was going the wrong way. But he went a significant distance traveling the wrong way down that freeway almost hitting other cars.

. . . .

. . . He nipped a car and caused a bit of damage to another car, and then another woman also had her car damaged by the defendant, I believe after he hit Ms. Damske's car.

The man that was almost hit, he actually was hit but he did not sustain any injuries, was a fireman for the City of Milwaukee Fire Department; and the defendant, even after that, continued travelling the wrong way down the freeway.

The defendant killed a beautiful, loving mother. She was 34 years old.

. . . She had a young child who has to live the rest of her life without her mother, and I don't know how one explains to a child what happened here . . . . That child is going to have to live the rest of her life without her mother because of what the defendant did.

The defendant's blood level was .145, close to twice the amount of the legal amount allowed in the State of Wisconsin for a prima facie case for intoxication.

6

. . . .

The defendant, as the Court knows, was not supposed to be driving. He did not have a valid driver's license; and not only that, he had been convicted of operating without a license two separate times. . . .

. . . .

Quite frankly, the public would have been safer if he was firing bullets down the freeway, rather than driving a vehicle the wrong way down the freeway at the speed that he was driving. It was a weapon.

Literally, the car was a weapon on that freeway, and anyone that came in contact with him or saw him coming down the freeway at the speed he was coming down the freeway the wrong way, obviously, would have been terrified and endangered.

¶10 Following that introductory statement, the circuit court heard statements on Damske's behalf. The first statement came from Damske's mother, Sharon Hvala, who made a few remarks before reading from a prepared statement, which began,

Everyday I wake up to the unbelievable, that I will never see my daughter again. The darkest day of my life is when the detective came to the door and showed me pictures to identify her, [a] parent's worst nightmare.

I was never able to say goodbye or hold her in my arms or tell her how much I loved her and how much she meant to me. She died alone in the most tragic way on that cold highway.

As she neared the end of her statement, Damske's mother specifically requested that the court impose a harsh punishment:

Your Honor, I know that there is nothing that will ever bring my daughter back. But I do ask that the judgment would be a fair one, and one that will perhaps give others pause before they get behind the wheel.

7

Mr. Gayton made a choice, a choice to live for years in this country without citizenship, a choice to drive without a valid license after being stopped twice by police, a choice again to elude police by not stopping, driving drunk and going the wrong way on the expressway. And all of these choices that he made ultimately claimed the life of my daughter.

Mr. Gayton will eventually be able to go on with his life. While I'll be visiting my daughter at her grave. I can't imagine life without her.

. . . Corrie and our family have been given a life sentence.

¶11 Next, the circuit court heard from Michele Friedman, Damske's close friend. Friedman began by describing the severe impact of Damske's death on her friends and family; she then also asked the court to impose a harsh sentence:

The fact of the matter is his punishment should follow the strictest penalties allowed by law. He not only committed the crime of vehicular homicide, but he has committed others as well, such as being pulled over twice for driving without a license.

Killing Corrie was not his first act of lawlessness. It was just one of a series of times for which he was caught. He had no intentions of complying with any of the laws in this country, and that was proven when his feet hit U.S. soil as an illegal immigrant.

At the time of this homicide, he had no license, no insurance and no intention of respecting the law that governs our country.

He came to this country and availed himself of the privileges we provided to our citizens, but he had no intentions to complying with our laws. Then he stepped up his lawlessness by killing a productive, passionate, beautiful and loving individual.

. . . .

8

The issue of punishment is one that some judges are remiss to do in similar cases and give him the maximum.  15 years in prison and after that a swift deportation is a well-deserved punishment.  Please give him every hour of prison he deserves and let him sit behind bars for as long as the law allows.

.  .  .  .

A punishment of less than the maximum, 15 years in jail and 10 years of supervision, a/k/a, deportation, would also unduly depreciate the seriousness of this crime.

¶12 Following the statements on Damske's behalf, Salas Gayton's attorney, Heather Johnson, spoke on behalf of her client.  She began by extending condolences to Damske's family and friends and by acknowledging that "[t]his is a serious offense, and there is just no two ways around that."  Asking the circuit court to treat Salas Gayton the same as it would treat any other offender under similar circumstances, she noted that drunk driving "is an offense committed across the board in the community by people of all ages, races, background, citizens and non-citizens [alike]."  In response to the statements made on Damske's behalf, she reviewed Salas Gayton's "almost completely clean criminal record" and argued that "to say that he had no intention of following the laws of this country and basically has broken every law that he had an opportunity to do, it's just not true."  She focused instead on his work history, noting,

He is proud to say that he has always supported himself, despite knowing that the community is upset that he is here.  He wants people to know that he has never received or applied for any help from the government, government aid or any other community resources.  He has always maintained himself and tried to help his family and friends.

9

¶13 Salas Gayton's attorney later returned to the issue of citizenship status and engaged in a brief exchange with the court on the matter:

> [MS. JOHNSON:] The fact as I see it that Mr. Salas is not a citizen in my opinion, as it relates to this case, is not terribly relevant. He came——
>
> THE COURT: It goes to character.
>
> MS. JOHNSON: I agree. He did come to this country to work. He has positively supported himself in the community. For the most part, he has stayed out of the criminal justice system. To say that he does not value our laws [or has] been a detriment to the community, I don't think is an honest statement.

¶14 She concluded her comments by asking the court to impose less than the maximum period of confinement, followed by extended supervision. Following her comments, the circuit court heard from the mother of Salas Gayton's girlfriend and from Salas Gayton himself.[8]

¶15 After hearing all of these statements, the court imposed a sentence——15 years confinement followed by 7 years of extended supervision[9]——and explained its reasons for doing so. We reproduce the court's statement in full:

---

[8] Salas Gayton addressed the court through an interpreter.

[9] Homicide by intoxicated use of a vehicle is a Class D felony. Wis. Stat. § 940.09(1)(a), (1c) (2009-10). The punishment for a Class D felony is "a fine not to exceed $100,000 or imprisonment not to exceed 25 years, or both." Wis. Stat. § 939.50(3)(d) (2009-10). Of the maximum 25 years imprisonment "[f]or a Class D felony, the term of confinement in prison may not exceed 15 years." Wis. Stat. § 973.01(2)(b)4. (2009-10).

10

THE COURT: When I sentence somebody, I have to set goals with my sentencing.  One of the goals is restitution.  In this case, that was very easy.  As in most cases, it's very easy.  It's $11,075.

I wish the other goals were as easy.  They're not.  The other goals are punishment, deterrence. That means sending a message to you, Mr. Salas, as well as everybody in the community, that you just can't get behind a wheel of a car, 4,000 pounds, a 4,000 pound weapon, if you're intoxicated, without suffering the consequences.  That's deterrence.

Then the last goal is rehabilitation, and that's somewhat hampered in this case by your status. Because I don't know what the United States Government is going to do with you when this sentence is over.  I don't know if they are going to deport you.  I have no power in that regard.

How do I accomplish these goals?  Well, the first thing I look at is the serious nature of the crime. Then I look at what the community wants and demands, and I don't just speak for Corrie.

I don't just speak for anybody that died as a result of a drunk driver.  I speak for the entire community, the victim's side and the defendant's side. They're also victims.

Then the last thing I have to do is consider your character and everything that Leopoldo Salas is. Let's talk about the serious nature of the crime.

A young woman is dead, 34 years old, beautiful, out on the first day of the year driving.  Minding her own business and tragically taken away from us.

You were driving drunk the wrong way on the freeway.  There was some indication that you were afraid that you were going to be stopped for driving. You apparently had been warned by somebody, maybe the judge in Racine County, that you can't drive.

There is a reason that we have licenses in this country and all the world, and that is we just don't let anybody get behind that automobile which can be a weapon.

11

Mr. Williams said in your state you might have been better shooting a gun at the freeway. You probably would have missed everybody, rather than aiming the weapon that you did.

You, by all accounts, didn't try to do anything about it. You entered on 35th Street. This happened on 20th Street. That's a good mile. You're driving freeway speeds, 50 miles an hour. You sideswiped a firefighter. You don't stop. You told me in your letter, quote, I didn't even know I was driving.

THE INTERPRETER: That's the truth.

THE COURT: Yes, I know. The fact that you're an illegal alien doesn't enter into the serious nature of the crime or the need to protect the community. It goes to character. It's a minor character flaw very honestly.

The fact that you didn't have a driver's license entered into it, the fact that you were driving the wrong way, the fact that you were speeding, the fact you went a mile, the fact that didn't know, didn't even know that you were driving, that enters into it, because that makes what you did that much worse.

And you were drunk, .145, and apparently this is the first time that you've ever been driving drunk, at least according to the law. Is that the case? I don't know.

But I am struck by a statistic I read some place, and I don't know the exact statistic, but that drunk drivers who kill aren't the ones that are driving four or five times as drunk drivers. It's the first time.

That leads me to—well, a little bit more about the problems; apparently, you had an argument, disagreement, call it what you want, so you had a couple of beers at home, and you had 12 beers in your car. You were driving around throwing beer cans out of the car, according to the complaint. I don't know.

It leaves me what the community wants. I mean, the newspapers, the media has just been full of articles and stories about drunk drivers. Our newspaper did a whole year where they talked every day

12

about another tragedy, about drunk drivers, people that died.

Look around in the courtroom, four televisions. We've got four major television stations, four cameras in this courtroom, because the community wants to know what happens to you. They want to know what happens to somebody who takes a car, a weapon, and drives drunk and kills somebody. That's the message that I have to get out to the community.

I was joking with my bailiff before the case started about face time that I get or he gets on TV. That doesn't make any difference. If I had one wish, what I would ask is that the television stations say, you drive drunk——first time, second time, third time, fourth time, fifth time——you go to prison.

I would——everybody in this community thinks, pauses, as this victim's mother said, before getting behind a wheel when you have a couple of pops.

We talked about the victim. Mr. Williams talks about my last week in this court. Yeah, it is. I've seen too many young people killed. Too many parents have come here and said they're tired of burying [their] kids. It is a parent's worst nightmare to have to bury your child. I hope this gives you closure.

There was no intent to kill here. There was an intent to drive drunk. He knew it. You knew you couldn't handle that car. That's the intent. He didn't set out to kill somebody that day, but you did set out to drive drunk.

I have read the letters. It's going to be tough for [Damske's daughter] to get along. She's young. She has got a very good support network.

So now we talk about you, which is the last thing that I have to consider. And other than January 1st of 2011, you seem to be a pretty decent guy.

I ignore what went on with the presentence writer. I can understand that happened, your lack of cooperation. You're in this country. You don't understand the way we do things. I can understand it.

13

I don't excuse it.   It would help if I got the information anyway.

You're from the nation of Mexico.   You've got a fifth grade education.   You're in this county for 13 and a half years, Milwaukee for two years.   You've got three kids in Mexico.

You've apparently got a temper.   That's why the mother of the children left you in Chicago.   Something about a restraining order is what she told Dr. Pankiewicz.

You've got sporadic employment, trying to better yourself.   That's why you're in this country. Although you're here illegally, it's a factor, a minor factor, but it goes to your character.

It was interesting to read in Dr. Pankiewicz's report that you apparently were sober for three and a half years.   There it is, on page 2.   "Mr. Salas indicates . . . he has had a drinking problem for many years.   He has been able to stop drinking for long periods of time intermittently."

"He states his last episode of sobriety was for three and a half years" without relapsing.   The drinking occurring on Christmas Day, 2010, and then your mother-in-law-to-be tells me about the disagreement that you had with your fiance.   So I guess I know why you were drinking on New Years Eve.

I tend to buy that, given the letter she wrote me, that the change you apparently made in your life. She talked about how one of the children knew you.

Alexis knew you as Miguel, knew you in a very bad period of time and how she said you've changed and how you were good to her and her kids.   "He showed me a whole new world, a world I never knew.   That world [is] his world[, a] world of God."

"I started going to church with him.   I got to meet his church family.   I really enjoy this new life. I[t] felt like this is where I should be."

14

That tends to corroborate the fact that you were sober for three and a half years, and something set you off.  Unfortunately, it resulted in a tragedy.

Dr. Pankiewicz diagnosed you as an alcoholic. That's true.  You accepted responsibility.  You didn't put this family through the trial, of looking at the gruesome autopsy pictures, of sitting here in this courtroom for a week listening to people describe what happened to their daughter and friend.

Mr. Williams talks a little bit about it and they burst into tears.  You deserve some credit for that. I see the remorse.  Rarely does a defendant come in here like you and exhibit tears that you did, and they're genuine.  I see that.

Like so much else, I have to weigh everything. So you are going to go to prison.  I can't put him on probation.    That would unduly depreciate the seriousness of what he did.

When he gets out, if he's allowed to live in this country, well, then he'll be subject to the rules of extended supervision.  And if he violates those rules, he goes back to prison for the time that I'm about to give him on extended supervision.

What are the rules?  No new law violations rising to the level of probable cause.  Cooperate with his agent.  No contact with weapons of any kind.  No contact at all with the family of Corrie.

He will cooperate and participate with alcohol and drug assessment.  Follow through with the recommended treatment.  Ms. Johnson correctly stated that it never intervened in his life.  Never had a serious enough crime for us to try and intervene.  But he could have done that on his own, even as an illegal in this country.

There's plenty of places on the south side of Milwaukee that cater to Latinos that would help them with their drinking problems.  He could have done it on his own.  He didn't.

He will be subject to random urines.  No use or possession of any alcohol, illegal drugs or drug

15

paraphernalia.    No contact with drug dealers.    No contact with drug users or drug houses.

The Department of Corrections has got to give him some grief counselling.  He's dealing with this too. He has punished himself, and he will continue to punish himself for the rest of his life.

He asked me for forgiveness.  That is not within my power.  I can't forgive.  Judges don't do that.

Absolutely no driving, any motor vehicle, unless you have a license.  I will revoke his driving privileges in the State of Wisconsin for five years as I'm required to do under this law.

When you get out, if you're allowed to be in this country, you will seek and maintain full-time employment.  While you are in prison, you get yourself a GED or an HSED; so that even if you're not allowed back in this country and you go back to Mexico, you have those skills.

You will give a DNA test, be responsible for all of the costs of this action, including a DNA surcharge.  That is part of the punishment, part of the rehabilitation.  The restitution will come first and then the costs.  We will take the costs and the restitution out of his prison account of 25 percent.

The term of extended supervision finally will result in judgment.  He's not eligible for the Challenge Incarceration Program or the Earned Release Program.  Due to the serious nature of the offense, I will not give him a risk reduction sentence.

The fact that you took remorse, that you showed remorse, the fact that you've accepted responsibility does not outweigh what you did and in the matter that you did it on January 1, 2011.

So, therefore, the sentence of this Court is serving a term of confinement in the Wisconsin State Prison of 22 years, 15 years of initial confinement, seven years of extended supervision Count 1.  Credit for 203 days.  On Count 3, nine months, concurrent to the time in Count 1.  Credit for 203 days.

16

> I have tried to be fair with you. If you don't feel I've been fair with you, your lawyer will tell you how you can appeal my decision. Basically, you have 20 days.

¶16 After receiving multiple extensions from the court of appeals, Salas Gayton filed a motion for postconviction relief pursuant to Wis. Stat. § (Rule) 809.30 and Wis. Stat. § 971.08(2). He sought an order vacating his plea and conviction on the grounds that the circuit court failed to properly advise him of the immigration consequences of his no contest pleas, as required by Wis. Stat. § 971.08(1)(c). In the alternative, he sought an order vacating his sentence and ordering a new sentencing hearing on the grounds that the circuit court erroneously exercised its discretion because it failed to set forth an adequate explanation for the imposition of its sentence. For similar reasons, he also requested an order vacating imposition of the DNA surcharge. The Milwaukee County Circuit Court[10] denied his motion.

¶17 The court of appeals affirmed the circuit court's denial of Salas Gayton's postconviction motion. State v. Salas Gayton, No. 2013AP646-CR, unpublished slip op., ¶1 (Wis. Ct. App. Oct. 7, 2014). Salas Gayton renewed his argument that the circuit court failed to provide an appropriate basis for imposing the maximum initial confinement period of 15 years, but the court of appeals concluded that the circuit court provided a sufficient explanation. Id., ¶¶16-17. Additionally, the court

---

[10] Ellen R. Brostrom, Judge.

17

of appeals rejected his argument that the circuit court improperly relied on his alien status when imposing its sentence. Id., ¶¶18-19. The court of appeals agreed with the circuit court that Salas Gayton's "willingness to violate this country's immigration laws was a reflection of his character," adding that, "as the circuit court also opined, it was nowhere near dispositive." Id., ¶19. Finally, the court of appeals also rejected his argument that the circuit court failed to provide a sufficient reason for imposing the DNA surcharge. Id., ¶¶20-22.

¶18 Salas Gayton filed a petition for review, which this court granted on November 5, 2015. This court's order granted review of a single issue: "[W]hether a sentencing court may rely on a defendant's illegal immigrant status as a factor in fashioning a sentence; and if such reliance is improper, whether it is a structural error or subject to a harmless error analysis . . . ."

## II. DISCUSSION

¶19 We review a circuit court's sentencing determination for erroneous exercise of discretion. State v. Gallion, 2004 WI 42, ¶17, 270 Wis. 2d 535, 678 N.W.2d 197. An exercise of discretion "contemplates a process of reasoning. This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards." State v. Taylor, 2006 WI 22, ¶17, 289 Wis. 2d 34, 710 N.W.2d 466

(internal quotation mark omitted) (quoting McCleary v. State, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971)).

¶20 A circuit court must state the reasons for its sentencing decision on the record.  Wis. Stat. § 973.017(10m); Gallion, 270 Wis. 2d 535, ¶40.  Under the erroneous exercise of discretion standard, "the circuit court's determination will be upheld on appeal if it is a reasonable conclusion, based upon a consideration of the appropriate law and facts of record." Peplinski v. Fobe's Roofing, Inc., 193 Wis. 2d 6, 20, 531 N.W.2d 597 (1995) (citing Hartung v. Hartung, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981)).  "[A] reviewing court may search the record for reasons to sustain the circuit court's exercise of discretion."  State v. LaCount, 2008 WI 59, ¶15, 310 Wis. 2d 85, 750 N.W.2d 780; see also Peplinski, 193 Wis. 2d at 20 (exercise of discretion "will be upheld if the appellate court can find facts of record which would support the circuit court's decision" (citing Maier Constr., Inc. v. Ryan, 81 Wis. 2d 463, 473, 260 N.W.2d 700 (1978))).

¶21 "Sentencing decisions of the circuit court are generally afforded a strong presumption of reasonability because the circuit court is best suited to consider the relevant factors and demeanor of the convicted defendant."  Gallion, 270 Wis. 2d 535, ¶18 (alteration omitted) (quoting State v. Borrell, 167 Wis. 2d 749, 781-82, 482 N.W.2d 883 (1992)); see also State v. Grady, 2007 WI 81, ¶32, 302 Wis. 2d 80, 734 N.W.2d 364; State v. Harris (Denia), 119 Wis. 2d 612, 622, 350 N.W.2d 633 (1984).

19

¶22 When making a sentencing determination, a court must consider the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant, as well as any appropriate mitigating or aggravating factors. Wis. Stat. § 973.017(2); State v. Naydihor, 2004 WI 43, ¶¶26, 78, 270 Wis. 2d 585, 678 N.W.2d 220; Gallion, 270 Wis. 2d 535, ¶40. Our cases have detailed various additional factors that a circuit court might consider within its discretion:

> (1) Past record of criminal offenses; (2) history of undesirable behavior pattern; (3) the defendant's personality, character and social traits; (4) result of presentence investigation; (5) vicious or aggravated nature of the crime; (6) degree of the defendant's culpability; (7) defendant's demeanor at trial; (8) defendant's age, educational background and employment record; (9) defendant's remorse, repentance and cooperativeness; (10) defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention.

State v. Harris (Landray M.), 2010 WI 79, ¶28, 326 Wis. 2d 685, 786 N.W.2d 409 (quoting Harris (Denia), 119 Wis. 2d at 623-24); see also Gallion, 270 Wis. 2d 535, ¶43 & n.11 (citing Harris (Robert Lee) v. State, 75 Wis. 2d 513, 519-20, 250 N.W.2d 7 (1977)).

¶23 The sentencing court considers a variety of factors because it has a responsibility "to acquire full knowledge of the character and behavior pattern of the convicted defendant before imposing sentence." Elias v. State, 93 Wis. 2d 278, 285, 286 N.W.2d 559 (1980). "[A] sentencing court needs the fullest amount of relevant information concerning a defendant's life and characteristics." State v. Frey, 2012 WI 99, ¶45, 343

Wis. 2d 358, 817 N.W.2d 436 (citing Williams v. New York, 337 U.S. 241, 247 (1949)). Accordingly, "The sentencing court or jury must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." State v. Guzman, 166 Wis. 2d 577, 591, 480 N.W.2d 446 (1992) (quoting Wasman v. United States, 468 U.S. 559, 563-64 (1984)). The scope of the information that a court may consider includes "not only 'uncharged and unproven offenses' but also facts related to offenses for which the defendant has been acquitted.'" Frey, 343 Wis. 2d 358, ¶47 (quoting State v. Leitner, 2002 WI 77, ¶45, 253 Wis. 2d 449, 646 N.W.2d 341).

¶24 Despite the broad range of factors that a sentencing court may consider, its discretion is not unlimited. Imposing a sentence "based on or in actual reliance upon clearly irrelevant or improper factors" constitutes an erroneous exercise of discretion. Harris (Landray M.), 326 Wis. 2d 685, ¶30 (emphasis omitted). A defendant will prevail on a challenge to his or her sentence if he or she proves by clear and convincing evidence that the circuit court actually relied on an improper factor at sentencing. Id., ¶34.

¶25 A defendant's nationality is one of several factors that a court may not rely upon when imposing a sentence that is consistent with a defendant's due process rights. See Pepper v. United States, 562 U.S. 476, 489 n.8 (2011) ("A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." (quoting United States v.

21

Leung, 40 F.3d 577, 586 (2d Cir. 1994)); State v. Alexander, 2015 WI 6, ¶23, 360 Wis. 2d 292, 858 N.W.2d 662.

¶26 Salas Gayton now contends that the circuit court improperly relied upon his alienage and immigration status as aggravating factors when making its sentencing determination. He argues that reference to his status as an "illegal alien" invoked prejudicial stereotypes and was an intrinsically improper factor. He further suggests that use of such terms implicitly invoked his Mexican nationality and therefore was a thinly-veiled substitute for sentencing him based on his national origin.

¶27 The State responds that barring a court from ever mentioning or considering a defendant's immigration status would be inconsistent with the longstanding principles favoring circuit courts having access to as much information as possible when sentencing a defendant. According to the State, a defendant's immigration status or the fact that a defendant immigrated to the United States illegally can be relevant to the conduct for which a court imposes a sentence.

¶28 At the outset, we observe that the sentencing transcript demonstrates that when considering the protection of the public, the gravity of Salas Gayton's offense, and Salas Gayton's rehabilitative needs, the circuit court placed an overwhelming emphasis on the perils of drunk driving. As the circuit court imposed sentence on a person who, without knowing what he was doing, drunkenly drove in the wrong direction on a major freeway and caused a tragic, fatal collision, the court

made clear its objective, explaining that if it "had one wish," it would be that the publicity surrounding the case would reinforce in the public's mind that if "you drive drunk——first time, second time, third time, fourth time, fifth time——you go to prison." Expanding on that objective, the circuit court added its hope that "everybody in this community thinks, pauses, . . . before getting behind a wheel" after drinking.

¶29 The circuit court specifically noted that Salas Gayton's immigration status did not "enter into [its evaluation of] the serious nature of the crime or the need to protect the community." Rather, as the circuit court discussed the seriousness of the offense together with the protection of the public, it compared Salas Gayton's vehicle to a "weapon" that, under the circumstances, was more dangerous than a gun fired indiscriminately down the freeway. Anything short of sending Salas Gayton to prison "would unduly depreciate the seriousness of what he did."

¶30 Salas Gayton's personal struggles with alcoholism and maintaining sobriety were also a predominant factor for the circuit court when considering Salas Gayton's rehabilitative needs. The circuit court acknowledged that, aside from Salas Gayton's conduct that resulted in tragic consequences on January 1, 2011, he "seem[ed] to be a pretty decent guy." Although he had "been able to stop drinking for long periods of time intermittently," he had never sought formal treatment——which "he could have done . . . on his own, even as an illegal in this country"——and the time in prison would give him an opportunity

23

for treatment following a full alcohol and drug assessment, as well as skills training through a GED or HSED program.

¶31 Relative to the circuit court's emphasis on the dangers of drunk driving, Salas Gayton's immigration status constituted no more than a "minor factor" in the court's sentencing determination. Twice, the circuit court indicated that it considered Salas Gayton's immigration status when evaluating his character, first noting, "The fact that you're an illegal alien . . . goes to character. It's a minor character flaw very honestly." Later, the court added, "Although you're here illegally, it's a factor, a minor factor, but it goes to your character." When discussing rehabilitation for Salas Gayton, the court also observed that the possibility of eventual deportation complicated the court's decision by making it difficult to predict Salas Gayton's circumstances upon release from confinement.

¶32 We are not persuaded by Salas Gayton's contention that the circuit court in this case denied him due process of law by considering his immigration status as a minor aggravating factor when imposing his sentence. Because Salas Gayton has previously engaged in conduct contrary to federal immigration law, his prior disregard for the law was an acceptable factor for the circuit court to include in its assessment of his character.

¶33 Further, we note that his immigration status was directly relevant to one of the charges for which he received a

24

sentence: driving without a license.[11]    In Wisconsin, a noncitizen may obtain a driver's license by presenting certain documentation that proves lawful admission to, permanent residency in, or temporary residency in the United States.  See Wis. Stat. § 343.14(2)(es).   There is no indication in the record that Salas Gayton possessed any documentation that would have allowed him to obtain a driver's license as a noncitizen; therefore, his unlawful entry into the United States prevented him from possessing a license to operate the vehicle that he used on the day of the collision.  Because his unlawful entry related to an element of a crime for which he was convicted, it was not improper for the circuit court to consider his immigration status as an aspect of his character for sentencing purposes.  Cf. Frey, 343 Wis. 2d 358, ¶47.

¶34 Moreover, the cases that Salas Gayton cites for the proposition that a court may not consider a defendant's immigration status at sentencing do not absolutely foreclose consideration of unlawful conduct related to immigration.

¶35 Unlike the sentencing court in Salas Gayton's case, which referred to his immigration status in a limited way

---

[11] Wisconsin Stat. § 343.05(5)(b)3.d. (2009-10) provided:

Any person who, in the course of operating a motor vehicle which is not a commercial motor vehicle upon a highway in this state knowingly without a valid operator's license issued to the person by the department . . . , causes the death of another person is guilty of a Class A misdemeanor.

25

related to his conduct of immigrating illegally, the trial courts in some of the cited cases articulated an overt deterrence objective based on nationality. See, e.g., Leung, 40 F.3d at 585 ("The purpose of my sentence here is to punish the defendant and to generally deter others, particularly others in the Asiatic community because this case received a certain amount of publicity in the Asiatic community, and I want the word to go out from this courtroom that we don't permit dealing in heroin and . . . it is against the customs of the United States, and if people want to come to the United States they had better abide by our laws."). In particular, the district court's comments under review in United States v. Borrero-Isaza, 887 F.2d 1349 (9th Cir. 1989), left the "unavoidable" conclusion that the defendant "was penalized because of his national origin, and not because he trafficked in drugs that emanated from a source country":

> [H]e comes from a country of origin, namely, Colombia, which is a country that supplies much of the narcotics to this country.
>
> . . . [They] are the total scourge of this country right now, and I am not going to tolerate it, and I want the message to go to Colombia that we are not going to accept this kind of thing.

887 F.2d at 1353, 1355. The circuit court in Salas Gayton's case certainly matched the fervor of the sentencing courts in Leung and Borrero-Isaza, but the court here spoke with passion about the evil of drunk driving and its concomitant effect on Salas Gayton's sentence, rather than suggesting that Salas

26

Gayton's nationality or immigration status mandated a stiff sentence.

¶36 Other cases that Salas Gayton cites note the principle that sentencing courts may not constitutionally impose a sentence based on national origin——a principle that this court unquestionably embraces. See Alexander, 360 Wis. 2d 292, ¶23. But those cases nevertheless leave open the possibility that a sentencing court might consider a defendant's relevant illegal conduct related to immigration without denying the defendant due process of law. See, e.g., Yemson v. United States, 764 A.2d 816, 819 (D.C. 2001) ("This does not mean . . . that a sentencing court, in deciding what sentence to impose, must close its eyes to the defendant's status as an illegal alien and his history of violating the law, including any law related to immigration."). Even the most inflexible of the cases that Salas Gayton cites——which holds that "immigration status per se is not relevant"——acknowledges that "circumstances that demonstrate a defendant's unwillingness to conform his conduct to legal requirements, whether or not there are criminal consequences, may be" relevant to a sentencing determination. State v. Zavala-Ramos, 840 P.2d 1314, 1316 (Or. Ct. App. 1992). "Faced with the responsibility of sentencing . . . , the judge [cannot], and would . . . [be] remiss if he did, ignore the realities of the case." United States v. Gomez, 797 F.2d 417, 420 (7th Cir. 1986) (concluding that when defendant's "entry into this county had been illegal," that "illegal act is no

27

different than any other recent prior illegal act of any defendant being sentenced for any offense").

¶37 Review of the circuit court's sentencing comments in their entirety thus satisfy us that the court imposed a harsh sentence on Salas Gayton because of his dangerous conduct operating a vehicle while intoxicated and the tragic consequences of that act. Any references to his immigration status implicated the unlawful aspects of his presence in the United States, which were directly relevant to his conviction for homicide while operating a vehicle without a driver's license.

¶38 Accordingly, we conclude that Salas Gayton has not demonstrated that the circuit court erroneously exercised its discretion by imposing a sentence with the maximum period of confinement for homicide resulting from intoxicated operation of a vehicle in the wrong direction on a busy freeway. Because we conclude that the circuit court did not rely upon an improper factor at sentencing, we do not evaluate whether its references to Salas Gayton's immigration status constituted harmless error.

### III.  CONCLUSION

¶39 Salas Gayton pled no contest to causing the untimely death of Corrie Damske by his action of driving a vehicle in the wrong direction on a freeway after consuming a substantial quantity of alcohol. At sentencing, the circuit court imposed the maximum 15-year period of confinement, as well as a 7-year period of extended supervision, and in doing so the court discussed the seriousness of the crime and the importance of

imposing a sentence that would deter people from engaging in similar conduct in the future. As a minor aspect of its comprehensive evaluation of Salas Gayton's character, the circuit court also mentioned his immigration status, which was relevant to his conviction for causing a death while operating a motor vehicle without a license. Because we conclude that the circuit court's comments did not deny Salas Gayton due process in the form of reliance on an improper sentencing factor, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶40  PATIENCE DRAKE ROGGENSACK, C.J., did not participate.

¶41 ANN WALSH BRADLEY, J. *(concurring).* After parsing and reframing the issues raised by the petitioner, this court ultimately asked the parties to address issues including the following: "whether a sentencing court may rely on a defendant's illegal immigrant status as a factor in fashioning a sentence."[1] The majority declines to address this important question of first impression.

¶42 Because appeals claiming error based on a sentencing court's multiple referrals to a defendant's immigration status appear to be on the rise,[2] I write separately to provide guidance in this ever expanding area of law.

¶43 Rather than focusing on the facts of this individual case, I discuss the broader principles of law and examine the question the parties were asked to brief but remains unaddressed by the majority.

---

[1] Unless it is included in quoted text, I avoid using the term "illegal alien." I chose to use the term "undocumented immigrant" instead. Although no shorthand term may be perfect, I join the United States Supreme Court as well as other courts that use the term "undocumented immigrant." Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100 (2009); De La Paz v. Coy, 804 F.3d 1200 n.1 (5th Cir. 2015) (Prado, J., dissenting); In re Garcia, 315 P.3d 117, 120 n.1 (Cal. 2014). Use of this term avoids some of the problematic and pejorative connotations of alternative terms.

[2] As court of appeals Judge Kessler observed in her concurrence, appeals claiming error in sentencing based on the sentencing court's multiple referrals to a defendant's race, ethnicity, or immigration status appear to be on the rise. State v. Gayton, No. 2013AP646-CR, unpublished slip op., ¶23 (Wis. Ct. App. Oct. 7, 2014) (Kessler, J., concurring).

1

¶44 Additionally, I write separately because the majority creates an explanation for the circuit court's exercise of discretion not set forth on the record. By creating its own explanation, the majority contravenes Wisconsin's long-standing jurisprudence, which does not permit appellate courts to invent a rationale for sentencing decisions not found in the record.

¶45 Instead, circuit courts must clearly set forth the rationale for sentencing so that it can be subject to meaningful appellate review. State v. Gallion, 2004 WI 42, ¶49, 270 Wis. 2d 535, 678 N.W.2d 197. This requirement was established in McCleary v. State, 49 Wis. 2d 263, 182 N.W.2d 512 (1971), reinvigorated in Gallion, and is sub silencio eroded by the majority opinion.

¶46 Accordingly, I respectfully concur.

I

¶47 There are three broad principles of law implicated in this discussion: alienage, immigration status, and the act of unlawful entry into the United States. I address each in turn.

A

¶48 At the onset, as the majority correctly observes, this court has repeatedly stated that nationality and national origin are improper sentencing factors.[3] Majority op., ¶25 (citations omitted). However, we have yet to provide similar guidance with

---

[3] National origin refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came. Espinoza v. Farah Mfg. Co., Inc., 414 U.S. 86, 88-89 (1973). Thus it is "an immutable characteristic determined solely by the accident of birth." Frontiero v. Richardson, 411 U.S. 677, 686 (1973).

2

respect to reliance on a defendant's alienage as an aggravating factor at sentencing.

¶49 The term "alien" refers to any person who is not a citizen of the United States.[4] 8 U.S.C. § 1101(a)(3). "Alienage" is the condition of being a noncitizen. Black's Law Dictionary 88 (10th ed. 2014).

¶50 In Graham v. Richardson, the United States Supreme Court explained that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny" and that "[a]liens as a class are a prime example of a 'discrete and insular' minority for whom [] heightened judicial solicitude is appropriate." 403 U.S. 365, 372 (1971) (internal citations omitted).

¶51 Constitutional protections afforded to noncitizens include the rights of due process and equal protection. Plyler v. Doe, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); Hines v. Davidowitz, 312 U.S. 52, 69 (1941) ("Our Constitution and our Civil Rights Act have guaranteed to aliens 'the equal protection of the laws'. . ..").

¶52 In Plyler v. Doe, the United States Supreme Court struck down a Texas statute that allowed schools to deny

---

[4] Finding the use of the term "alien" to be offensive, the Sixth Circuit has urged Congress to eliminate the term from the U.S. Code. Flores v. U.S. Citizenship and Immigration Servs., 718 F.3d 548, 551 n.1 (6th Cir. 2013). I refer to it here only because it remains a term of art in federal immigration statutes.

enrollment to undocumented immigrant children. 457 U.S. 202. In so doing, the Court clarified that both due process and equal protection rights apply to all noncitizens within its jurisdiction. Id. at 210-15. As the Plyer court explained, the Fourteenth Amendment applies to "any person within its jurisdiction" and that noncitizens——no matter their immigration status——are "surely [] 'person[s]' in any ordinary sense of that term." Id. at 210. Further, the Court rejected the notion that due process is of greater stature than equal protection and therefore available to a larger class of persons, explaining that "both provisions were fashioned to protect an identical class of persons, and to reach every exercise of state authority." Id. at 213.

¶53 Similarly in Hines, the Supreme Court struck down a Pennsylvania Act that imposed registration requirements on all adult noncitizens. 312 U.S. at 74. The Hines court explained that the promise and guarantee of broad rights and privileges to noncitizens has been vital to the federal government's efforts to secure treaties and advance international practices that provide the same protections to United States citizens abroad. Id. at 64-65. It considered "the treatment of aliens, in whatever state they may be located, a matter of national moment" and that discriminatory policies directed at aliens constituted "a departure from our traditional policy of not treating aliens as a thing apart." Id. at 73.

¶54 Based on these constitutional implications, the State acknowledged at oral argument: "it is not permissible to

4

sentence a person based on alienage . . ." I agree that courts may not rely on alienage as an aggravating factor at sentencing.[5]

¶55 This prohibition is consistent with the determinations in other jurisdictions. See, e.g., Yemson v. United States, 764 A.2d 816, 819 (D.C. 2001) (citing United States v. Gomez, 797 F.2d 417, 419 (7th Cir. 1986) for the proposition that treating a defendant more harshly at sentencing because of alien status "obviously would be unconstitutional."); United States v. Leung, 40 F.3d 577, 586-87 (2d Cir. 1994) (remanding for resentencing before a different judge because there was a sufficient risk that a reasonable observer might infer that the defendant's alien status played a role in determining her sentence).

---

[5] Empirical evidence indicates that a "citizenship penalty" exists when noncitizens——and undocumented immigrants in particular——face harsher criminal penalties than citizens. A study of data from U.S. federal courts revealed strong and consistent evidence that non-citizens are sentenced far more harshly than citizens among all racial and ethnic groups. Michael T. Light, Michael Massoglia, and Ryan D. King, Citizenship and Punishment: The Salience of National Membership in U.S. Criminal Courts, 79 Am. Sociological Rev. 827, 837, 841, 843-44 (Oct. 2014).

Specifically, documented immigrants are reported as twice as likely as citizens to be imprisoned, and undocumented immigrants are seven times more likely to be incarcerated than citizens. Id. at 837. The study further indicates that noncitizens receive longer prison sentences compared to U.S. citizens. Id. at 839. Additionally, citizenship status——for both legal and undocumented immigrants——appears more consequential for sentencing outcomes today than it was two decades ago. Id. at 840 (explaining that the "citizenship penalty" more than doubled between 1992 and 2008).

B

¶56 Having addressed the question of whether a sentencing court can rely on alienage (non-citizenship) as an aggravating factor at sentencing, I now narrow the focus to consider only those noncitizens who are undocumented. More precisely I examine the question the parties were asked to brief: "whether a sentencing court may rely on a defendant's illegal immigrant status as a factor in fashioning a sentence."

¶57 Unlike the alienage discussion above, I offer no definitive answer because the law is not well-settled. Some jurisdictions clearly prohibit sentencing courts from relying on a defendant's undocumented status as an aggravating factor at sentencing.[6] Others appear to.[7] And still others offer a more nuanced approach.[8]

---

[6] See, e.g., State v. Mendoza, 638 N.W.2d 480, 484 (Minn. Ct. App. 2002) (determining that the sentencing court erred by considering the defendant's immigration status and possible deportation); Martinez v. State, 961 P.2d 143, 145 (Nev. 1998) (concluding that basing a sentencing decision, in part, upon a defendant's undocumented immigration status would violate the defendant's due process rights); State v. Zavala-Ramos, 840 P.2d 1314, 1316 (Or. Ct. App. 1992) ("a defendant's current illegal immigration status cannot, per se, be considered to be an aggravating factor" because it is not relevant).

¶58 Even without a definitive resolution, it is still apparent that the inquiry gives rise to significant thorny issues and caution must be observed. The law may be unsettled as to the direct inquiry presented, but it is well settled that reliance on undocumented immigrant status as an aggravating factor at sentencing can raise significant constitutional concerns. Due process requires that sentencing be individualized, avoiding reliance on stereotypes or other

---

[7] See, e.g., People v. Hernandez-Clavel, 186 P.3d 96, 100 (Colo. App. 2008) (concluding that the sentencing court did not err in considering the circumstances surrounding the defendant's status as an undocumented immigrant when deciding whether to grant or deny probation); Trujillo v. State, 698 S.E.2d 350, 354 (Ga. Ct. App. 2010) (determining that the trial court did not violate the defendant's constitutional rights by considering his undocumented immigration status as a relevant factor in formulating an appropriate sentence); People v. Cesar, 14 N.Y.S. 3d 100, 102 (2d Dep't. 2015) (concluding that "while a defendant's undocumented immigration status may be considered by sentencing courts as one factor in determining whether an appropriate sentence should include incarceration, probation, or a combination of both, courts may not rely solely upon a defendant's undocumented immigration status in imposing a sentence of incarceration to the exclusion of all other relevant factors.").

[8] See, e.g., United States v. Flores-Olague, 717 F.3d 526, 535 (7th Cir. 2013) (determining it was not improper for the sentencing court to state in non-hyperbolic fashion that the defendant was in the country unlawfully and did not speak English because those statements were relevant to reflect the strength of the defendant's ties to the community as they relate to the likelihood of his successful post-incarceration adjustments to society); United States v. Ramirez-Fuentes, 703 F.3d 1038, 1047 (7th Cir. 2013) ("Although a sentencing court can, in its discretion, take into account a defendant's status as a deportable alien, it need not take into account those arguments that are frivolous or, in the context of the case, 'stock' arguments without specific application to the defendant") (internal citations omitted).

7

inaccurate information. State v. Harris, 2010 WI 79, ¶71, 326 Wis. 2d 685, 786 N.W.2d 409 (Ann Walsh Bradley, J., concurring); State v. Tiepelman, 2006 WI 66, ¶9, 291 Wis. 2d 179, 717 N.W.2d 1; Gallion, 270 Wis. 2d 535, ¶48.

¶59 "Individualized sentencing . . . has long been a cornerstone to Wisconsin's criminal justice jurisprudence." Gallion, 270 Wis. 2d 535, ¶48. Sentences must "be individualized to the defendant and his criminal conduct, and . . . bear a reasonable nexus to the recognized sentencing factors and objectives." Harris, 326 Wis. 2d 685, ¶101 (Ann Walsh Bradley, J., concurring); see also McCleary, 49 Wis. 2d at 275 (explaining that offenders are to be sentenced according to the needs of the particular case as determined by the offenders' degree of culpability and upon the mode of rehabilitation that appears to be of greatest efficacy).

¶60 Tailoring a sentence to address an individual defendant requires that sentencing courts refrain from relying on stereotypes, which are improper sentencing factors.[9] Harris, 326 Wis. 2d 685, ¶71 (Ann Walsh Bradley, J., concurring) (explaining that "[w]e all agree that stereotypes constitute improper sentencing factors . . .").

---

[9] Similarly, punishment based on a particular "status" is prohibited. See, e.g., Robinson v. California, 370 U.S. 660, 665-667 (1962) (determining that a California statute criminalizing the "status" of being addicted to narcotics was unconstitutional); United States v. Diamond, 561 F.2d 557, 559 (4th Cir. 1977) (concluding it is improper to consider a defendant's status as a nonresident of the state at sentencing); see also Jackson v. State, 772 A.2d 273, 282 (Md. 2001) (stating that a defendant's geographical origins "would clearly be an improper factor upon which to base a defendant's sentence").

8

¶61 Negative stereotypes about immigrants——and undocumented immigrants in particular——abound in some sectors. In response to such stereotypes, this court has recognized that evidence of an individual's undocumented immigration status has an "obvious prejudicial effect" on a jury when assessing loss of earning capacity in a negligence action. Gonzalez v. City of Franklin, 137 Wis. 2d 109, 139-40 (1987). Concerned about the effects of prejudice, the Gonzalez court explained that evidence of undocumented immigration status can only be introduced at the damages——but not the liability——phase of trial. Id. Similarly, circuit courts are prohibited from requiring defendants to disclose their citizenship status at the time a defendant enters a plea. Wis. Stat. § 971.06(3).

¶62 Defendants also have a constitutionally protected due process right to be sentenced upon accurate information. United States v. Tucker, 404 U.S. 443, 447 (1972); Tiepelman, 291 Wis. 2d 179, ¶9.

¶63 As this court has warned, "immigration law can be complex, and it is a legal specialty of its own." State v. Shata, 2015 WI 74, ¶42, 364 Wis. 2d 63, 868 N.W.2d 93. Accordingly, determinations about an individual's actual immigration status are left to specialized federal immigration courts and agencies. Arizona v. United States, 132 S. Ct. 2492, 2498-99 (2012) (stating that determinations about immigration status falls within the exclusive jurisdiction of the federal government).

¶64 Of the estimated 11 million undocumented immigrants in the United States, 76,000 live in Wisconsin, a group that

9

encompasses a great diversity of individuals and experiences.[10] Despite a perception held by some that all undocumented immigrants are law breakers or criminals, many immigrants are undocumented due to circumstances beyond their control. For example, so-called DREAMERS are undocumented immigrants who were brought to the United States when they were young. Plyler v. Doe, 457 U.S. at 219-20 (explaining that children who were brought to the United States unlawfully are not similarly situated to adults who entered the country unlawfully).

¶65 Other groups of immigrants who may at times be undocumented include asylum seekers fleeing persecution and victims of human trafficking. Further, undocumented victims of domestic violence may lack legal status solely because their abusers decline to file immigration papers on their behalf.[11] Many are subsequently granted permission to remain in the United States.[12]

---

[10] Jie Zong and Jeanne Batalova, Frequently Requested Statistics on Immigrants and Immigration in the United States, Migration Policy Institute (MPI) (Apr. 14, 2016), http://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states.

[11] See, e.g., Mary Ann Dutton, Leslye E. Orloff, and Giselle Aguilar Hass, Characteristics of Help-Seeking Behaviors, Resources and Service Needs of Battered Immigrant Latinas: Legal and Policy Implications, 7 Geo. J. on Poverty L. & Pol'y 245, 259 (Summer 2000).

[12] Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) ("DACA Memo"), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf; 8 U.S.C.

(continued)

¶66 Additionally, immigration status is mutable and can change frequently. Plyler v. Doe, 457 U.S. at 226 (explaining that undocumented immigrants may be granted permission to remain in the United States or even become citizens). Indeed, nearly half of all undocumented immigrants entered the United States legally, but later violated the terms of their admission.[13]

¶67 Given that immigration status is often a moving target, and may even change during the course of criminal proceedings, care should be taken to avoid making assumptions that may very well turn out to be false. See Gallion, 270 Wis. 2d 535, ¶36 ("Experience has taught us to be cautious when reaching high consequence conclusions about human nature that seem to be intuitively correct at the moment. Better instead is a conclusion that is based on more complete and accurate information and reached by an organized framework for the exercise of discretion."); United States v. Velasquez Velasquez, 524 F.3d 1248, 1253 (11th Cir. 2008) (remanding for resentencing because "a judge may not impose a more severe sentence than he

---

§ 1101(a)(15)(T)-(U) (relief for victims of human trafficking and other crimes who assist in the investigation or prosecution of criminal activity); 8 U.S.C. § 1154 (protection for some battered spouses of U.S. citizens); 8 U.S.C. § 1158(a)(1) ("any alien who is physically present in the United States . . . irrespective of such alien's status, may apply for asylum"); United States v. Velasquez Velasquez, 524 F.3d 1248, 1253 (11th Cir. 2008) (explaining that "because oppressive regimes do not easily permit their citizens to leave the country, many escape by using false papers; doing so does not disqualify them from seeking asylum.").

[13] Pew Hispanic Center, Modes of Entry for the Unauthorized Migrant Population, at 1 (May 22, 2006), http://www.pewhispanic.org/files/factsheets/19.pdf.

would have otherwise based on unfounded assumptions regarding an individual's immigration status or on his personal views of immigration policy").

¶68 In sum, relying on a defendant's undocumented immigrant status as an aggravating factor may lead sentencing courts down a slippery slope, potentially raising significant constitutional concerns. Care must be taken to ensure that sentences are individualized and do not rely on stereotypes, assumptions, or other inaccurate information.

C

¶69 I address next how a circuit court may consider a defendant's act of unlawful entry into the United States.

¶70 It is not a crime for an undocumented immigrant to remain in the United States. Additionally, removal proceedings of immigrants who are in the United States unlawfully are civil, not criminal, proceedings. Arizona v. United States, 132 S. Ct. at 2499. However, the act of unlawful entry into the United States is a federal crime, punishable by a fine and/or imprisonment of not more than six months for a first offense. 8 U.S.C. § 1325(a).

¶71 As the majority correctly states, sentencing courts may consider uncharged and unproven offenses as well as facts related to offenses for which the defendant has been acquitted. Majority op., ¶23 (citing State v. Frey, 2012 WI 99, ¶47, 343 Wis. 2d 358, 817 N.W.2d 436).

¶72 It follows that upon reliable and accurate information, sentencing courts may consider a defendant's act of unlawful entry into the United States in the same way that it

12

would consider any other unlawful or uncharged conduct. Gomez, 797 F.2d at 420 (explaining that unlawful entry is an act "no different than any other recent prior illegal act of any defendant being sentenced for any offense"); State v. Zavala-Ramos, 840 P.2d 1314, 1316 (Or. App. 1992) (concluding that "[i]mmigration status per se is not relevant. However, circumstances that demonstrate a defendant's unwillingness to conform his conduct to legal requirements, whether or not there are criminal consequences, may be.").

¶73 However, circuit courts that consider a defendant's act of unlawful entry should set forth clearly on the record how any unlawful entry is relevant to the sentence. See Gallion, 270 Wis. 2d 535, ¶¶42-43, 46. Sentencing courts must provide a "rational and explainable basis" for the sentence imposed. Id., ¶39 (citing McCleary, 49 Wis. 2d at 276). Implied rationale is insufficient. Id., ¶38. By explaining this linkage on the record, "courts will produce sentences that can be more easily reviewed for a proper exercise of discretion." Id., ¶46.

¶74 Other jurisdictions emphasize the importance of establishing a linkage between the act of unlawful entry and the defendant's individualized sentence. In Yemson, the sentencing court discussed the defendant's pending and prior charges including convictions for unlawful reentry into the United States. 764 A.2d at 818. The District of Columbia Court of Appeals upheld the sentence, concluding that the defendant's immigration status did not serve as the basis for the sentence, but rather that the sentence was based on the defendant's "unlawful conduct." Id. at 820.

13

¶75 <u>Yemson</u> explained that sentencing courts may consider a defendant's prior acts of unlawful reentry into the United States as such acts are relevant to the defendant's history of violating the law. <u>Id.</u> at 819. To successfully challenge such references, the defendant must demonstrate that the sentencing court's comments about his undocumented immigration status "bore no reasonable relationship to his established pattern of misconduct and that those comments formed the actual basis for the imposition of an enhanced sentence." <u>Id.</u>

¶76 Thus, sentencing courts that consider a defendant's prior <u>act</u> of unlawful entry into the United States can do so only upon accurate information that the defendant actually entered the country unlawfully, in the same way that it would consider any other unlawful or uncharged conduct. Additionally, sentencing courts should set forth clearly on the record how a defendant's act of unlawful entry is relevant to the sentence imposed.

II

¶77 Finally, I write because Wisconsin's long-standing jurisprudence examining review of sentencing decisions does not permit appellate courts to invent a rationale not found in the record.

¶78 Instead, circuit courts must clearly set forth the sentencing rationale so that it can be subject to meaningful appellate review. <u>Gallion</u>, 270 Wis. 2d 535, ¶49. This requirement was established in <u>McCleary</u>, reinvigorated in <u>Gallion</u>, and has become an essential part of the fabric of Wisconsin's sentencing law.

14

¶79 Nevertheless, the majority rests its conclusion that the circuit court properly exercised its discretion on a non-existent sentencing court rationale. In so doing, it appears to turn back the clock and erode the advances made in improving transparency and review of sentencing decisions.

¶80 The majority posits that the circuit court considered Salas Gayton's undocumented immigration status only when discussing the nature of the offense of operating without a license. It explains that Salas Gayton's "immigration status was directly relevant to one of the charges for which he received a sentence: driving without a license." Majority op., ¶33. Further, it contends that Salas Gayton's unlawful entry into the United States prevented him from possessing a driver's license and therefore "his unlawful entry related to an element of a crime for which he was convicted . . . ." Id. Reiterating its own rationale, the majority concludes that "any" references to Salas Gayton's immigration status were "directly relevant to his conviction for homicide while operating a vehicle without a driver's license." Majority op., ¶37.

¶81 The record reflects otherwise. Rather than linking Salas Gayton's undocumented immigration status with the nature of the offense, the circuit court emphasized that Gayton's immigration status was relevant only to its analysis of his "character" (emphasis added).

¶82 The sentencing record contains no expressed linkage between Salas Gayton's immigration status and the nature of the

15

offense of operating a vehicle without a license.[14]  Indeed, the sentencing court explicitly disclaimed it:  "The fact that you're an illegal alien doesn't enter into the serious nature of the crime or the need to protect the community.  It goes to character.  It's a minor character flaw very honestly." Majority op., ¶15.

¶83  Thus, by determining that references to Salas Gayton's immigration status were related to the offense of operating without a license, the majority creates a rationale not expressed by the circuit court.  Majority op. ¶¶33, 37.

¶84  To support its creation of an explanation for the sentencing decision, the majority relies on caselaw unrelated to sentencing.  It contends that an appellate court that reviews the exercise of sentencing discretion "may search the record for reasons to sustain the circuit court's exercise of discretion" and that a sentencing court's exercise of discretion "will be

---

[14] The sentencing court referred to the charge of driving without a license twice.  First it stated:

> You apparently had been warned by somebody, maybe the judge in Racine County, that you can't drive.  There is a reason that we have licenses in this country and all the world, and that is we just don't let anybody get behind that automobile which can be a weapon.

Later, when discussing the serious nature of the crime, the circuit court explained:

> The fact that you didn't have a driver's license entered into it, the fact that you were driving the wrong way, the fact that you were speeding, the fact you went a mile, the fact that you didn't know, didn't even know that you were driving, that enters into it, because that makes what you did that much worse.

16

upheld if the appellate court can find facts of record which would support the circuit court's decision." Majority op., ¶20 (citing State v. LaCount, 2008 WI 59, ¶15, 310 Wis. 2d 85, 750 N.W.2d 780) (discussing whether a circuit court erroneously admitted an attorney's expert opinion testimony about the defendant at trial); Peplinski v. Fobe's Roofing, Inc., 193 Wis. 2d 6, 20, 531 N.W.2d 597 (1995) (a negligence case examining the standard of review to be applied when addressing the sufficiency of the evidence for a res ipsa loquitur jury instruction)).

¶85 However, Wisconsin's long-standing sentencing jurisprudence does not permit appellate courts to search the record to support sentencing rationales never expressed.

¶86 Over four decades ago, this court in McCleary embraced a requirement that sentencing rationale be set forth on the record. The McCleary court clarified that "[d]iscretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning." 49 Wis. 2d at 277 (emphasis added). Emphasizing the import of the decision-making process, McCleary explained that "a principal obligation of the judge is to explain the reasons for his actions." Id. at 280-81. Accordingly, appellate review of sentencing decisions focuses on the circuit court's decision-making process, not just the sentence imposed. Id.

¶87 Gallion subsequently reinvorgated McCleary, reiterating that a sentencing decision cannot be understood or reviewed by appellate courts "unless the reasons for decisions can be examined." 270 Wis. 2d 535, ¶1 (citing McCleary, 49

17

Wis. 2d at 280-81). A circuit court's rationale for its decision serves to demonstrate that the sentencing decision was exercised on a "rational and explainable basis." Id., ¶49 (citing McCleary, 49 Wis. 2d at 276).

¶88 Relying on this distinction between making a decision and the process of decision-making, the Gallion court concluded by setting forth the requirements for appellate review of sentencing: appellate courts are to review the circuit court's linkages between the relevant facts, sentencing factors, and sentencing objectives evident on the record and closely scrutinize the record to ensure that the basis of the circuit court's exercise of discretion is set forth. 270 Wis. 2d 535, ¶¶46, 76.

¶89 Because the majority opinion erodes this requirement, I respectfully concur.

¶90 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this concurrence.