**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**February 14, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No.    2023AP1842** | **Cir. Ct. No.  2023ME129** |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS**<br>**DISTRICT II** |

IN THE MATTER OF THE MENTAL COMMITMENT OF B.R.C.:


WINNEBAGO COUNTY,

   PETITIONER-RESPONDENT,

 V.

B.R.C.,

   RESPONDENT-APPELLANT.


APPEAL from orders of the circuit court for Winnebago County: MICHAEL S. GIBBS, Judge. *Affirmed*.

¶1 LAZAR, J.[1] Brooke[2] appeals from orders for her involuntary commitment under WIS. STAT. § 51.20(1)(a)2. and for the involuntary administration of medication and treatment under WIS. STAT. § 51.61(1)(g). Brooke asserts that, contrary to ***Langlade County v. D.J.W.***, 2020 WI 41, ¶59, 391 Wis. 2d 231, 942 N.W.2d 277, the trial court failed to make specific factual findings of dangerousness with reference to a particular paragraph of § 51.20(1)(a)2. She also asserts that Winnebago County did not satisfy its burden to prove that Brooke was dangerous under either § 51.20(1)(a)2.a. or 2.b. by admissible clear and convincing evidence. Finally, Brooke asserts that the County did not provide clear and convincing evidence that she is either incapable of expressing an understanding, or substantially incapable of applying an understanding, of the advantages and disadvantages of the prescribed medication to her mental illness. Thus, she contends, both orders must be reversed.

¶2 This court concludes that the trial court in this case made sufficient specific factual findings to support a commitment decision. There was sufficient admissible evidence of dangerousness under both subdivision paragraphs presented to the trial court. And the trial court's finding that Brooke was substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to her condition in order to make an informed choice as to whether to accept or refuse psychotropic medication and treatment

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] In order to protect her confidentiality, pursuant to WIS. STAT. RULE 809.19(1)(g), this court refers to the subject individual by the pseudonym she selected.

was not clearly erroneous based upon the testimony and evidence. Both orders are affirmed.

## BACKGROUND

¶3    The County filed a Statement of Emergency Detention for Brooke seeking her commitment under WIS. STAT. ch. 51 on April 17, 2023. Brooke had been taken into custody several days earlier after her parents reported to law enforcement that she had "attacked her dad," made "suicidal statements," and exhibited other threatening or dangerous behavior due to her declining mental health. At a final hearing on the County's request, the County relied on testimony from Brooke's parents and Dr. Marshall Bales, a psychiatrist who had examined Brooke, to show that she met the statutory requirements for involuntary commitment and medication.

¶4    Bales opined that Brooke suffers from bipolar disorder and that she is manic and psychotic. He confirmed that bipolar disorder is a substantial disorder of thought, mood, and perception that grossly impairs her judgment. When questioned about his opinion as to whether Brooke is a danger to herself or others, he stated:

> Primarily the dangerousness is the assaultive behavior but also this almost a confusion where in the middle of the night she's in the road, it was dark out, and the neighbor felt her to be at risk and brought her home and that's one example where she's simply at risk. And she confirmed that, by the way. There's some details how much traffic, how far in the road and some things but it was alarming, especially considering that she's not fully reality based, but separately she's been getting assaultive and threatening to her family ….

¶5    Bales also testified that Brooke, a normally "pretty high functioning" teacher and mother, is "definitely treatable." Given her "lack of insight into

getting help voluntarily," he said that she needs medication and treatment and went on to identify the particular medication he recommended. Bales went on to summarize his discussions with Brooke about the purpose of the medication as well as its advantages and disadvantages. Bales's report was received into evidence.

¶6     Brooke's parents had reported to law enforcement that Brooke had been staying with them due to her mental health. At the hearing, Brooke's mother testified that among other increasingly strange behavior, on the night before her detention, Brooke told her, "[D]on't be surprised if your body is not here tomorrow…. I'll be here, but you won't be." This caused her mother to question whether Brooke might suffocate her and also prompted her to have her other daughter stay elsewhere out of safety concerns. Brooke also told her mother that she would need the suicide hotline number "really soon," which her mother understood meant that either Brooke would become suicidal or Brooke would kill her and "stage it that [she] committed suicide."

¶7     Brooke's father testified that when he had been in the house with her trying to calm her down shortly before her detention, Brooke "just went crazy and scratched [his] arm," which started bleeding. Immediately after that incident, Brooke told him "that the weatherman was going to get [him] and he was going to be carrying a lime green gun."

¶8     Finally, Brooke testified on her own behalf. She stated that she was taking the medication Abilify, which helped her sleep and mood. She refuted her father's account of the events preceding her detention, saying, "At no point did I touch him." On cross-examination, Brooke stated that she did not believe she was mentally ill, but that she was taking her medication because she "was court-

ordered to take the Abilify" which she also said she was taking "by choice." She said she was "trying to follow the advice of medical health professionals and … the Court."

¶9    The trial court found that the County met its burden to prove the requisite dangerousness for commitment, stating that

> the Court having heard the testimony of Doctor Bales, as well as both parents of [Brooke], and having heard from [Brooke] herself, does make the following findings: Relying heavily upon the opinion of the medical professional here -- that being Doctor Bales -- the County has met the burden showing by clear and convincing evidence that [Brooke] is currently suffering from a major mental illness, that being bipolar disorder with manic and psychotic tendencies, which is a treatable condition. Though it is a substantial disorder of her thought, her mood, and her perception, it is grossly impairing her judgment as well as her behavior and her capacity to recognize reality.
>
> She has had recent episodes of spiritually grandiose thinking, paranoid delusions. The testimony today is clear that she is a danger to herself and others, so the County has met the burden under both the A and the B standards.

¶10    The court also concluded that Brooke was incompetent to refuse medication, citing her "lack of insight into her condition." The court's six-month involuntary commitment and medication orders expired on October 27, 2023, the day Brooke filed her opening brief in this appeal.

## DISCUSSION

¶11    To issue a civil commitment order, a trial court must find by clear and convincing evidence that a subject individual is mentally ill, a proper subject for treatment, and dangerous to herself or others under at least one of the five statutory standards. ***D.J.W.***, 391 Wis. 2d 231, ¶29; WIS. STAT. § 51.20(1)(a)1.-2.,

5

(13)(e). These findings are critical; "[i]t may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction." *Addington v. Texas*, 441 U.S. 418, 428 (1979).

¶12 The review of a civil commitment order—determining whether the petitioner has met its burden of proof—"presents a mixed question of law and fact." *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. A trial court's findings of fact are upheld "unless they are clearly erroneous," *id.*, and appellate courts will "accept reasonable inferences from the facts." *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Whether those facts satisfy the statutory standards, however, is a question of law that is reviewed de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

## I. Mootness of the appeal

¶13 Our supreme court has determined that mental commitment appeals are not moot based upon two (or possibly three) collateral consequences. *See Sauk County v. S.A.M.*, 2022 WI 46, 402 Wis. 2d 379, 975 N.W.2d 162. For one, the subject individual is subject to a firearm prohibition. *Id.*, ¶23. This appears to be Brooke's first commitment and there are no allegations in the Record to indicate that she was subject to a prior firearm prohibition (e.g., from a felony charge).[3]

---

[3] In her Reply, Brooke asserts that "she has no prior convictions, no restraining orders, and no prior commitments," and, obviously, because no one can provide evidence of a negative, this court takes her counsel's statements at face value.

¶14 The second collateral consequence mentioned in *S.A.M.* is that a county may seek to recoup payments for care and medication from the subject individual. *Id.*, ¶24; *see also* WIS. STAT. § 46.10(2). In this case, as in many (if not most), the County has made no indication that it would seek such reimbursement, nor has Brooke's counsel indicated that a financial reimbursement demand was made by the County.

¶15 The County asserts that one or both of these collateral consequences *may* not apply to Brooke, but it provides nothing in support of that statement. Regardless of the possible lack of a viable, non-moot appeal here, this court will address the merits.

## II. The trial court made specific factual findings.

¶16 The key to the first issue in this appeal is an analysis of whether the trial court made "specific factual findings with reference to the subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2. on which the []commitment is based." *See D.J.W.*, 391 Wis. 2d 231, ¶40.[4] The *D.J.W.* court set out the rationale underlying this requirement. "First, it provides clarity and extra protection to patients regarding the underlying basis for a []commitment." *Id.*, ¶42. Civil commitments are significant curtailments of an individual's personal liberty and

---

[4] The requirement for specific factual findings set forth in *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, applies to both recommitments (at issue in that case) as well as initial commitments. *See Winnebago County v. A.A.L.*, No. 2020AP1511, unpublished slip op. ¶17, n.8 (Mar. 24, 2021) ("We recognize that [*D.J.W.*] specifically dealt with recommitment proceedings, but we see no reason why the court's mandate would not apply for initial commitments as well. The 'purpose of making specific factual findings' is equally applicable to initial commitments." (citation omitted)). Pursuant to WIS. STAT. RULE 809.23(3)(b), this court cites to this unpublished opinion for "persuasive value" only.

they can carry an additional deprivation of personal autonomy when accompanied with an involuntary medication and treatment order.

¶17 Second, as the ***D.J.W.*** court elaborated:

> a requirement of specific factual findings ... will clarify issues raised on appeal of []commitment orders and ensure the soundness of judicial decision making, specifically with regard to challenges based on the sufficiency of the evidence. *See **Klinger v. Oneida** [**County**]*, 149 Wis. 2d 838, 846-47, 440 N.W.2d 348 (1989) ("[A]s this court has stated many times, the [trial] court must make a record of its reasoning to ensure the soundness of its own decision making and to facilitate judicial review."). A more substantial record will better equip appellate courts to do their job, further ensuring meaningful appellate review of the evidence presented in []commitment proceedings.

***D.J.W.***, 391 Wis. 2d 231, ¶44 (third alteration in original).

¶18 Appeals to this court based upon an arguable lack of specific factual findings by the trial court are multiplying and it is clear that all sides could benefit from clarity on the point. As this court and our supreme court is wont to state, there are no magic words required by the law. ***State v. Brown***, 2020 WI 63, ¶27, 392 Wis. 2d 454, 945 N.W.2d 584 ("The law generally rejects imposing 'magic words' requirements."); *see also **Patchak v. Zinke***, 583 U.S. 244, 251 (2018) (noting that the Supreme Court refrains from reading statutes to "incant magic words" (citation omitted)). That being said, there are certain steps that each trial court in a mental commitment rotation should take when issuing findings and conclusions. First, the court should set out what it looked at and what it heard to form the basis for its opinion (e.g., the court has heard from expert X, witnesses Y and Z, and the subject individual, and has reviewed the following documents). Next, the court should summarize the testimony that supports (or does not support) a finding of mental illness, dangerousness, and treatability and state which

witnesses it found to be credible. With respect to dangerousness, the court should clearly state which paragraph(s) the County is seeking to establish dangerousness under as well as which paragraph(s) the court finds to be applicable; these may not necessarily be the same. The court should also tie the evidence to the standard (e.g., witness Y indicated that he was in fear of his safety, witness Z heard the individual make suicidal statements, or the subject individual told the expert that a particular event took place). The more detailed the better (as well as the less likely to be overturned on appeal). Finally, the trial court should read out loud the factual findings and conclusions contained in the standard order form for commitment orders and involuntary administration of medication and treatment orders.

¶19 In outlining these specific factual findings, the trial court is not required to issue a complete compendium of all of the prior testimony. As with all exercises of discretion, however, trial courts must make sure that the record indicates what they considered and how their decisions were made. Our state supreme court nicely summarizes how appellate courts discern whether an exercise of discretion was made:

> [W]e first look to "the record to see whether that discretion was in fact exercised." [*J.A.L. v. State*, 162 Wis. 2d 940, 961, 471 N.W.2d 493 (1991).] The exercise of discretion incorporates a process of reasoning and proper explanation. *State v. Salas Gayton*, 2016 WI 58, ¶19, 370 Wis. 2d 264, 882 N.W.2d 459 ("An exercise of discretion contemplates a process of reasoning. This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards." (quotations and citations omitted)); *McCleary v. State*, 49 Wis. 2d [263], 277, 282, 182 N.W.2d 512 [1971] (holding that a circuit court that did not provide adequate reasoning or explanation for a discretionary decision "fail[ed] to exercise discretion," and explaining that "[d]iscretion is not synonymous with decision-making"); *State v. Hall*, 2002

9

> WI App 108, ¶¶16-17, 255 Wis. 2d 662, 648 N.W.2d 41 (reasoning that a discretionary decision that was supported by minimal and inadequate explanation by a circuit court "reflect[ed] decision making" but not "a process of reasoning based on a logical rationale," as is required for a proper exercise of discretion (citations and quotations omitted)).

*State v. X.S.*, 2022 WI 49, ¶33, 402 Wis. 2d 481, 976 N.W.2d 425.

¶20    That brings us to the instant matter and the findings actually placed on the Record regarding Brooke.  The trial court listed the witnesses who testified and indicated it was "[r]elying heavily upon the opinion of the medical professional."  The court explained that Brooke's disorder "is grossly impairing her judgment as well as her behavior and her capacity to recognize reality."  Then, it itemized the concerning behavior:  "She has had recent episodes of spiritually grandiose thinking, paranoid delusions."  This spiritually grandiose reference, albeit not a recitation of the exact testimony, obviously relates to a large portion of Brooke's mother's testimony, including the following:

> [Brooke] was telling me that she was reincarnated and she was a witch and was burned at the stake ....  She was a bad person that died in a concentration camp.  She was speaking to dead people....  All of these dead people were channeling through her ....
>
> [Brooke] said that she had to do a deep cleansing because there was an Indian -- a native American Indian outside her bathroom door and he was scalped and she said that was one of the most scariest of the evil spirits that's been with her ....
>
> [Brooke indicated] she was Eve and [was] going to [the] Garden of Eden, she said she was really, really tired and she needed to go lay down.  And she went down -- she went to lay down like ten minutes and came up and said, no, it's the 7th day when you need the day of rest, which would have been Sunday, so I didn't know if all of this was leading up to Sunday when she was going to end it all.

¶21    Brooke's mother testified that after telling her that her body wouldn't be there the next day, Brooke threw her passport, driver's license, and things from her children into a bag that she tossed into a fire pit. It is reasonable to infer, from this testimony as well as from Bales's Report (which was admitted into evidence)[5] that the trial court found Brooke's conduct to be a sound basis upon which to conclude that she was dangerous under the relevant statutory provisions. While the trial court's findings were not more fully bolstered[6] with those examples of her spiritual grandiosity, they surely are sufficient, when taken with the reasonable inferences from the record, to conclude that there were specific factual findings. These findings are sufficient to allow appellate courts to

---

[5] In Dr. Bales' Report of Examination, dated April 22, 2023, marked at trial as Petitioner's Exhibit 2, he explains:

> On April 14, 2023 the detention document notes that [Brooke] attacked her father leaving marks. She also was noted when detained to state "you're not going to be here tomorrow. Your spirit will be, but your body won't". Around this time she was speaking of demonic spirits as well.
>
> [Brooke] admitted these threats, but then when I interviewed her she started talking about spiritual baths and other delusional sounding subjects.... The crisis department noted as well that she spoke of her parents being dead the next day. She was found to be delusional and putting her parents in fear. She was declining voluntary mental health care. Crisis noted scratches nearly the entire length of [Brooke's] father's forearm. He later reported that he feared for his safety.
>
> When interviewed [Brooke] seemed euphoric and elevated in mood. She talked about spiritual awakenings. She was delusional. She confirmed the concerns leading to being in seclusion. She denied any mental illness and particularly saw no need for psychotropic medications. She appears fairly intelligent, but does lack insight into her condition.

[6] This court, again, encourages trial courts to more fully detail the bases upon which they make their findings of dangerousness.

conduct a meaningful review of the trial court's exercise of discretion and the evidence presented at the hearing.[7]

¶22    Finally, the County asserts that Brooke forfeited her right to bring this appeal based on a lack of specific factual findings by not raising that argument during the trial or to the trial court in a postdisposition motion. While the court agrees with Brooke that there is no basis for the forfeiture argument, it also believes that civil litigation, in particular in cases of mental commitment, is not a game; litigants should not be holding back on asking trial courts to make complete and proper records and findings. The extraordinarily large influx of appeals in mental commitment cases is starting to overwhelm the appellate court system. All parties, and the trial courts, should be taking great pains to ensure that rulings are supported by admissible evidence and the appropriate factual findings are stated in full on the record.

### III.    There was sufficient admissible evidence of dangerousness.

¶23    Brooke next argues that the County offered insufficient admissible evidence to support a finding that she was dangerous under either relevant statutory paragraph. She further contends that evidence that was admitted into the Record, as well as Bales's reports, were inadmissible hearsay upon which the trial court should not have relied. The County contends that there was no error and no

---

[7] The County also contends that a failure to make specific factual findings per ***D.J.W.*** is harmless error and that "Brooke's substantial rights were not affected by the [trial] court's failure to recite how specific facts applied to each element of the two standards when [the trial court] had just listened to the testimony of all the witnesses, including Brooke's." If this were correct, ***D.J.W.*** would be gutted because a trial court could summarily say "ditto" and commit the individual for up to one year. It takes less than five minutes to summarize and pull out those specific facts upon which such an important ruling is based.

admission of hearsay through Bales's testimony or reports, but that even if there were, there was still sufficient evidence in other witnesses' and Brooke's own testimony to support the court's finding of dangerousness.

¶24 Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3). It is generally inadmissible. WIS. STAT. § 908.02. But Bales testified as an expert. Under WIS. STAT. § 907.03, an expert may rely on otherwise inadmissible evidence, such as hearsay, if the evidence is of the type experts typically rely upon to form their opinions. In the context of WIS. STAT. ch. 51 commitments, testifying expert physicians are expressly permitted to rely upon an individual's treatment records, WIS. STAT. § 51.20(1)(am), and they may use that review as a basis to formulate their opinions as to the three key issues. *See* § 51.20(9)(a)5.

¶25 "It is well settled that it is 'proper for a physician to make a diagnosis based in part upon medical evidence of which he has no personal knowledge but which he gleaned from the reports of others.'" ***Walworth County v. Therese B.***, 2003 WI App 223, ¶8, 267 Wis. 2d 310, 671 N.W.2d 377 (quoting ***Karl v. Employers Ins. of Wausau***, 78 Wis. 2d 284, 299, 254 N.W.2d 255 (1977)). The court in ***Therese B.*** noted "two important qualifications of this rule." ***Id.***, 267 Wis. 2d 310, ¶8. "First, although WIS. STAT. § 907.03 allows an expert to base an opinion on hearsay, it does not transform the hearsay into admissible evidence." ***Therese B.***, 267 Wis. 2d 310, ¶8. Second, it "does not give license to the proponent of an expert to use the expert solely as a conduit for the hearsay opinions of others." ***Id.***, ¶9.

¶26 Brooke's mother testified about Brooke's strange spiritual and delusional behavior in the days leading up to her commitment. There were comments about reincarnation, spirits, witches, and more. Of most concern were Brooke's comments about her mother's body not being present the next day and her mother's need for the suicide hotline telephone number: either for Brooke or for herself. One would be a statement of Brooke's suicide ideation, the other a threat to the life of Brooke's mother. Her mother saw Brooke take actions to attempt to destroy her identification documentation and her children's toys. Her mother further testified that she was afraid for her own safety and for that of her other daughter and that she also believed that Brooke intended to hurt herself. Brooke's mother was a witness to all these statements and actions; they are not inadmissible hearsay.

¶27 Brooke's father testified about Brooke's reaction to him and how she scratched his arm. He also testified about Brooke's comment that the "weatherman" with a "green gun" was coming for him. None of these statements are hearsay (even though Brooke testified that she never scratched or attacked her father).

¶28 Finally, the trial court admitted Bales's two expert reports (over Brooke's hearsay objections). In those reports, there are additional statements made by Brooke to Bales in which she admits walking into the road at night in dark clothing. These statements are not hearsay because Brooke was the source of the information. Statements made by a party—or, in this case, the subject individual—are not hearsay and are admissible. *See* WIS. STAT. § 908.01(4)(b)1.; ***State ex rel. Kalt v. Board of Fire and Police Comm'rs for Milwaukee***, 145 Wis. 2d 504, 516, 427 N.W.2d 408 (Ct. App. 1988).

¶29 Even without Brooke's statements to Bales, there was sufficient, admissible evidence that established, by clear and convincing evidence, that Brooke was making statements about self-harm or suicidal ideation and that Brooke's mother and father were in reasonable fear for their safety from violent behavior and serious bodily harm from Brooke. Her mother clearly was frightened enough to send their other daughter away and had fears that Brooke was planning on either suffocating her with a pillow or killing her and staging it to look like a suicide. Merely because neither parent was certain when and how Brooke would possibly harm them does not mean that they were not in reasonable fear of violent behavior or physical harm from their daughter. Accordingly, Brooke has failed to establish a basis for reversal on this issue.

## IV. The involuntary medication and treatment order was properly issued.

¶30 As a final issue, Brooke asserts that because she was able to express her understanding of the advantages and disadvantages of the available medications for her condition, the trial court erred when it ordered her to comply with involuntary medication and treatment. This court agrees that a person can be mentally ill "yet nevertheless capable of evaluating the advantages and disadvantages of taking psychotropic drugs and making an informed decision" about the same. *Outagamie County v. Melanie L.*, 2013 WI 67, ¶45, 349 Wis. 2d 148, 833 N.W.2d 607 (citation omitted). It further agrees that mere disagreement with a physician's medication or treatment recommendations does not establish that someone is incompetent to make those decisions. *See Virgil D. v. Rock County*, 189 Wis. 2d 1, 15-16, 524 N.W.2d 894 (1994). But, that is not determinative in and of itself—the actual testimony in each trial must be examined.

¶31    Here, Brooke was able to identify the medication she had been prescribed, how it seemed to assist her, and some of the side effects that could result from that medication.  She stated that believed the medication was helping her and that "[a]side from improved sleep, [she] fe[lt] pretty healthy."  But, upon cross-examination she clearly stated that she did not believe she was mentally ill.  Brooke first stated that she was only taking the medication because she was court-ordered to do so, and that medical health professionals advised her to take it.  She then contradicted herself, stating that even though she doesn't have a mental health disorder, she would continue taking it if not under court orders.

¶32    In its second order, the trial court found that, due to her mental illness, Brooke was not competent to refuse psychotropic medication or treatment because she was *both* (1) "incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives" and (2) "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to … her condition in order to make an informed choice as to whether to accept or refuse psychotropic medication."  Appellate courts will not disturb a trial court's findings of fact unless they are clearly erroneous.  *Melanie L.*, 349 Wis. 2d 148, ¶38.  As noted previously, reasonable inferences can be relied upon and the appellate courts can search the lower court record for support.  *Christopher S.*, 366 Wis. 2d 1, ¶50.

¶33    Bales testified as to Brooke's lack of insight into her mental condition[8] and wrote in his report that she:

---

[8] For instance, Bales testified that "[t]he problem is her lack of insight into getting help voluntarily which she gives me the definite impression she would not do."

16

denied mental illness and, therefore, could not see the need for psychotropics nor weigh pros and cons of them. She has also self-medicated with marijuana. In my opinion, she could not competently refuse psychotropics. An involuntary medication order is requested.

¶34 The trial court made the following findings after hearing the testimony of Bales, Brooke's parents, and Brooke:

Also there was testimony about her lack of insight into her condition, and though she is currently taking her medication, she did state herself that she did not believe that it was due to her medical condition, rather more to comply with court orders. So she is unable to express or apply an understanding of the medications as applicable to her condition.

¶35 This finding by the trial court—after hearing evidence from both Bales and Brooke as well as argument by counsel—is not clearly erroneous. The court found Brooke was mentally ill and, because she denied that condition, that she lacked insight into her mental illness and met both standards for the involuntary administration of medication and treatment. This court agrees that the evidence supports a finding that Brooke is substantially incapable of applying any understanding of the advantages, disadvantages, and alternatives to her condition precisely because, based on Bales's testimony and reports, she did not accept that she had a mental illness. Given Brooke's clear elaboration about her medication, how it improves her sleep, and the recitation of the different side effects, however, this court concludes that the evidence does not support a finding that Brooke was incapable of *expressing* an understanding of the disadvantages of treatment, but rather that she may not have been competent to express an understanding of the advantages or alternatives to treatment. Having concluded that one[9] of the bases

---

[9] *See* **Sweet v. Berge**, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (when one issue is dispositive of an appeal, we need not discuss other issues).

17

for ordering the involuntary medication was met, it is not necessary for this court to delve further and determine whether the trial court was in error for finding both bases applied.

## CONCLUSION

¶36     Civil commitments are massive curtailments of liberty, and citizens have the inherent right to be free from unjustified commitments. *See **Jones v. United States***, 463 U.S. 354, 361 (1983). There is "no constitutional basis for confining [someone who is mentally ill] if they are dangerous to no one and can live safely in freedom." ***O'Connor v. Donaldson***, 422 U.S. 563, 575 (1975). Courts, however, are required to commit individuals who do meet the three statutory factors of being mentally ill, treatable, and dangerous. WIS. STAT. § 51.20(1)(a)1.-2.

¶37     The trial court in this case made sufficient specific factual findings to support a commitment decision. There was sufficient admissible evidence of dangerousness under both statutory bases presented to the trial court. And, the trial court's finding that Brooke was substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to her condition in order to make an informed choice as to whether to accept or refuse psychotropic medication and treatment was not clearly erroneous based upon the testimony and evidence.

¶38     Accordingly, the commitment order and the corresponding order for involuntary administration of medication and treatment are affirmed.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.